UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| G&G Closed-Circuit Events, LLC,<br><br> Plaintiff,<br><br>v.<br><br>Jaime F. Castillo, Maria A. Castillo and El Bajio Enterprises, Inc.<br><br> Defendants. | Case No. 14-CV-02073<br><br>Judge Joan Gottschall<br>Magistrate Jeffrey Cole |
| Jaime F. Castillo, Maria Castillo and El Bajio Enterprises, Inc., on behalf of themselves and others similarly situated,<br><br> Counter-Plaintiffs,<br><br>v.<br><br>G&G Closed-Circuit Events, LLC,<br><br> Counter-Defendant. | |
| Jaime F. Castillo, Maria Castillo and El Bajio Enterprises, Inc., on behalf of themselves and others similarly situated,<br><br> Third-Party Plaintiffs,<br><br>v.<br><br>DirecTV International, Inc. a Delaware Corporation; DIRECTV, LLC, a California LLC; and the DirecTV Group, Inc., a Delaware Corporation,<br><br> Third-Party Defendants. | |

**SECOND AMENDED CLASS ACTION COUNTERCLAIM**

NOW COME Defendants/Counter-Plaintiffs Jaime Castillo, Maria Castillo, and El Bajio Enterprises, Inc., on behalf of both themselves and a class of Illinois consumers subject to this Plaintiff/Counter-Defendant's practices, and allege as follows:

## STATEMENT OF FACTS

1. Plaintiff/Counter-Defendant G&G Closed Circuit Events, LLC ("G&G") alleges to have obtained licensing rights to certain boxing matches.

2. Over the course of the last 10 – 15 years, rather than advertise and promote the boxing matches for which it alleges to have obtained rights, G&G[1] has been engaged in a nationwide scheme whereby it uses questionable means to entrap unsuspecting business and individual consumers who have allegedly violated their licensing rights, and then extort money from these consumers using threatening settlement and litigation tactics under the guise of 47 U.S.C. §§ 553 and 605.

3. This scheme has netted G&G and its agents, including but not limited to, the Law Offices of Thomas P. Riley ("Riley") millions of dollars.

4. Part of this scheme involves taking advantage of the fact that DirecTV frequently provides residential programming to businesses, particularly small minority-owned establishments.[2]

---

[1] Three boxing promotion companies – Joe Hand Promotions, J & J Sports Productions, and G&G, LLC all use the same law firms and the identical form letters and complaints to pursue their claims.

[2] Because of DirecTV's allegedly intentional error, as described in the Third-Party Complaint filed contemporaneously to this Second Amended Counterclaim, an unsuspecting establishment owner is able to order and pay the residential rate for a pay-per-view fight, or view the fight with no license at all in certain cases, not realizing that they do not have the appropriate commercial license. Alternatively, as was the case here, an investigator hired by

5. In the weeks prior to a boxing match being shown, G&G, either directly or through various agents, including, but not limited to Riley, enlists hundreds of investigators/auditors across the country to go in search of alleged violators of G&G's licensing rights on the night of the actual fight ("Fight Night").

6. These investigators/auditors are only paid for "hits," i.e. evidence against an alleged pirate, providing a tempting reason to lie, exaggerate or mislead. Said another way, the investigator/auditor is only paid if they provide G&G and/or Riley with alleged evidence that can be used to threaten the consumer/alleged pirate for money.

7. These investigator/auditors do not need to be private investigators or work under a licensed private investigator[3] and their work is not supervised directly by G&G or by Riley.

8. Riley refers to these investigators/auditors as "independent contractors," and not employees.

9. Riley's auditor/investigators are provided a form affidavit to complete, and encouraged to provide photos and/or video of their "hits," also by way of standardized instructions.

---

G&G and/or its agent Riley is able to request that the programming be turned on, and the owner/agent in the commercial establishment has no idea that honoring that request will put him/her and the establishment at risk of being accused of piracy.

[3] Although Riley's internal advertising materials claim that they only use "private investigators," very few of the investigator/auditors appear to have appropriate licensing or credentials.

10. These form affidavits have a line for an "investigator" signature, telephone number and agency but the individuals, agencies and telephone numbers listed are often impossible to verify or contact.

11. These investigators/auditors use questionable tactics to obtain their video and photos, including "crashing" private events; asking that a fight be turned on, knowing that it will entrap the establishment and its owners; staying in establishments after closing; or using photos and/or video from time periods other than Fight Night.

12. Investigators frequently lie and exaggerate on these affidavits, misstating the number of televisions, the size of the televisions, the occupancy of the establishment, the number of patrons present, the programming on the television, and other important facts, all in an effort to make their "hit" appear legitimate or more substantial.

13. The affidavits do not appear to be fact-checked or verified by G&G, Riley, or the local attorneys who eventually file these claims.

14. On April 20, 2013 Jaime and Maria were working at La Pena like most Saturday evenings.

15. Like most Saturday nights, La Pena had live music, the band "Umbral," from around 7 p.m. until 10:00 or 10:30 p.m., and then a DJ that played music for dancing.

16. The crowd at La Pena is largely Latino, and comes for the authentic Ecuadorian food and Latino music.

17. Jaime was bartending when an unfamiliar patron now believed to be G&G investigator/auditor Aaron Lockner, asked Jaime if he could put "the fight"[4] on.

---

[4] *Saul Alvarez v. Austin Trout* shown April 20, 2013 is referred to herein as "the Fight."

18. Jaime had no idea what Lockner was talking about, as he had never shown a boxing match at the establishment, and asked Lockner which channel he wanted.

19. Lockner gave Jaime the channel as a number value, and Showtime, the channel showing the Fight, appeared without any type of pay screen or special notice. Jaime left the fight on because Lockner had requested it, but did not turn the volume on because there was music playing.

20. La Pena had never shown a boxing match prior to the night of April 20, 2013 when Jaime did so only at Lockner's request. La Pena has not shown a boxing match since the night of April 20, 2013.

21. Upon information and belief, G&G required all commercial programmers to pay a licensing fee for the Fight, but Showtime broadcast the Fight without additional charge to all residential consumers who had Showtime as part of their cable and/or satellite package.

22. Plaintiff's agent Lockner was only able to trick Jaime into turning on the fight, and the fight was only visible in La Pena because DirecTV had set up an improper residential account in a commercial establishment.

23. Lockner did not disclose in his affidavit that he was the patron who requested that the Fight be turned on; he lied about the number of televisions showing the Fight; and he exaggerated both the occupancy of the establishment and the number of patrons in the establishment at the time of his visit.

24. Sometime after May 29, 2013 Jaime received a cookie-cutter threatening letter from Riley, addressed to him individually, alleging violations of "Title 47 U.S.C. Section 605 and or 47 U.S.C. Section 553, et seq."[5]

25. Jaime received another threatening letter from Riley's office on or about July 2, 2013.

26. Jaime phoned Riley's office on or about July 9, 2013 and a receptionist who spoke Spanish (Tiffany) took his information, and told him someone would get back to him. No one returned his call.

27. Jaime called Riley's office again on July 10 and July 11, and spoke with Tiffany and Vannesa, respectively. He was given an appointment to speak with an attorney named Julia.[6] The appointment was scheduled for July 15, 2013.

28. When Jaime spoke with Julie, she was pushy and short, claiming that she "knew he was guilty" and that he should settle.

29. Despite Jaime's strong Spanish accent, Julie never asked Jaime whether he understood English or whether he would prefer to talk through an interpreter.

30. Julie never suggested that Jaime could or should consult an attorney.

31. Julie did no Rule 11 investigation into the legality of G&G's purported claims. Specifically, she did not ask Jaime whether he had cable or satellite – a tactical omission that would allow G&G to pursue its claims under the more favorable language of § 605.

---

[5] Attached as Exhibit 1.

[6] Through discovery, Jaime has learned that "Julia" is former Riley contractor Julie Dadayan.

6

32. Relatedly, Julie did not make any inquiry into commercial gain or attempt to obtain any evidence to support a claim of enhanced damages.

33. Instead, Julie claimed that G&G had video of the alleged infraction, but never provided Jaime with a copy of the video or any other documentation to support her threats.

34. Julie never provided Jaime a statutory reference, or described any specific legal authority for the basis of G&G's claims.

35. Julie didn't ask Jaime any questions regarding commercial gain or willfulness, the only means to support alleged entitlement to enhanced damages under the statutes.

36. Julie never advised Jaime that the statute at issue contained a provision that might limit his damages to $100 or $250 if he had no knowledge of the wrongdoing.

37. Instead, Julie tried to convince Jaime that his only option was to settle, and demanded a minimum of $20,000.

38. Jaime explained that he did not have that kind of money, and told Julie that G&G would have to take him to court.

39. Assuming a commercial licensing fee of $800.00, G&G's demand was 25 times their alleged actual damages.

40. Plaintiff made this demand with no evidence of willfulness or commercial gain.

41. Jaime received at least two more threatening letters from Riley between August 2013 and January 2014[7] before G&G's current counsel filed this litigation in March of 2014.

42. Instead of doing appropriate due diligence and determining prior to suit under which statute the alleged violation may have occurred, G&G usually alleges claims under both

---

[7] Copies of the referenced letters are attached as Exhibit 3.

47 U.S.C. § 553 (relating to cable) and 47 U.S.C. § 605 (satellite) and requests statutory and enhanced damages under both statutes, including attorneys' fees.[8]

43. As with all Plaintiff's complaints, also a cookie-cutter document used by all three promotion companies, the Complaint filed in this case alleges violations of §605 and violations of §553. (See Docket No. 1.)

44. The Complaint does not make it clear that the two counts are in the alternative, and the civil cover sheet (Docket No. 2) contains an unsupportable demand for $300,000.00.

45. G&G, through its local counsel agent, files these complaints with full knowledge that the Seventh Circuit has held recovery is limited to the statute under which the violation occurred, and that a defendant can only be found liable under one statute.[9]

46. Interestingly, civil cover sheets filed by Plaintiff's counsel on behalf of these boxing promotion companies prior to the denial of the first Motion to Dismiss Defendants' Counterclaim in this case (Docket No. 27) requested $300,000; civil cover sheets filed after that order request $100,000 or leave the amount requested blank.[10]

47. G&G's Complaint alleges no facts linking the alleged distribution rights of Plaintiff/Counter-Defendant to any act or omission of Defendants/Counter-Plaintiffs.

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 et seq.**
**Unfair Practice under Section 2**

---

[8] Julie Lonstein, former counsel to J&J and Joe Hand, made it clear in her complaints that her claims under § 553 and § 605 were in the alternative. It is unclear why Riley and current local counsel abandoned that practice. (See sample Lonstein complaint, Exhibit 4.)

[9] See United States v. Norris, 88 F.3d 462 (7th Cir. 1996).

[10] (See civil cover sheets from 6/15/12 – 12/5/14 with demands of $300,000; civil cover sheets from 5/14/15 and 5/21/15 with demands of $100,000 or left blank; Group Exhibit 5.)

**(pled on behalf of these Defendants/Counter-Plaintiffs
and a class of similarly situated Illinois consumers)**

48. Defendants/Counter-Plaintiffs incorporate all prior paragraphs 1 – 47 of their Class Counterclaim as though fully set forth herein.

49. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by only compensating its investigators/auditors for "hits," providing them an incentive to lie, exaggerate and mislead.

50. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by failing to require credentials of its investigator/auditors and by not supervising or reviewing the investigators/auditors' work.

51. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by relying on form affidavits that provide a line for an investigator signature, telephone number and agency, but the individuals, agencies and telephone numbers listed are often impossible to verify or contact.

52. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice akin to entrapment by sending private investigators who use questionable tactics such as "crashing" private events; asking that a fight be turned on, knowing that it will entrap the establishment and its owners; staying in establishments after closing, or using photos and/or video from time periods other than Fight Night.

53. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by turning a blind eye to lies and misstatements contained in the investigator/auditor affidavits.

54. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by sending threatening form letters to consumers alleging violations of 47 U.S.C. § 553 and § 605.

55. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by implying "guilt" in a civil context.

56. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by refusing to provide copies of alleged "evidence" to consumers.

57. Plaintiff/Counter-Defendants and its agents have engaged in and continue to engage in an unfair practice by failing to provide any statutory reference or specific legal authority or other basis for their alleged claims to consumers and/or their advisors.

58. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by failing to investigate their entitlement to enhanced damages.

59. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by failing to advise consumers of the existence of a statutory provision that might limit their damages to $100 or $250 if there is no knowledge of the wrongdoing.

60. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by not providing interpreters and/or failing to suggest to consumers that they could or should consult an attorney.

61. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by suggesting to consumers that their only option is settlement.

60. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by demanding large dollar settlements with no statutory basis.

62. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by making large dollar settlement demands without evidence of willfulness or commercial gain.

63. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by targeting small business owners and individuals who do not speak English as a primary language because it believes these individuals will be susceptible to threats regarding "guilt," and/or may be especially vulnerable to misrepresentations regarding their legal rights.

64. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by performing no investigation into which statute may apply prior to fling suit.

65. Plaintiff/Counter-Defendant and its agents have engaged in and continue to engage in an unfair practice by alleging violation of both statutes and requesting damages of $300,000 when this district limits their award to damages under one statute.

66. Plaintiff/Counter-Defendants and its agents undertake these practices with the specific and unlawful intent that these Defendants/Counter-Plaintiffs, and scores of Illinois consumers like them, rely to their detriment on unfair representations and actions described above.

67. Plaintiff/Counter-Defendant and its agents' unfair and deceptive actions occurred and continue to occur within the course of trade or commerce, and implicate the

protection concerns for these Defendants/Counter-Plaintiffs and other Illinois consumers who are being subjected to these unfair practices.

68. The practices of Plaintiff/Counter-Defendant and its agents alleged hereto offend the public policy of the State of Illinois.

69. The practices of Plaintiff/Counter-Defendant and its agents alleged hereto are immoral, unethical, oppressive, and/or unscrupulous.

70. The practices of Plaintiff/Counter-Defendant and its agents alleged hereto have caused, and continue to cause, substantial injury to Illinois consumers.

71. Defendants/Counter-Plaintiffs, and scores of Illinois consumers like them, have suffered actual damages including, but not limited to, out-of-pocket expenses and attorneys' fees, settlement amounts and default judgments.

72. Defendant/Counter-Plaintiff's damages, and damages suffered by other Illinois consumers, are all proximately caused by Plaintiff/Counter-Defendant and its agents' unfair practices.

WHEREFORE, Defendants/Counter-Plaintiffs respectfully request that this Court award damages resulting from these violations as follows:

(a) compensatory damages for themselves and a class of equally damaged Illinois consumers in an amount to be determined at trial;

(b) punitive damages for themselves and a class of equally damaged Illinois consumers in an amount to be determined at trial;

(c) all costs and attorney's fees; for themselves and a class of equally damaged Illinois consumers;

(d) any additional amounts the Court deems just and reasonable.

## JURY DEMAND FOR CLASS COUNTERCLAIM

Respectfully submitted,

/s/ Lisa L. Clay
Counsel for Defendants/Counter-Plaintiffs

Lisa L. Clay, Attorney at Law
345 North Canal Street, Suite C202
Chicago, Illinois 60606
Phone: 312.753.5302
lclayaal@gmail.com
ARDC # 6277257

## CERTIFICATE OF SERVICE

Lisa L. Clay, an attorney, certifies on March 4, 2016 she served a copy of the foregoing *Second Amended Class Action Counterclaim*, by filing same via the ECF filing system, to the following:

Andre Ordeanu
andre@zanesmith.com

Zane Smith
zane@zanesmith.com

Shedon Gomberg
sgom@sbcglobal.net

Daniel Rubinstein
drubenstein@winston.com

William O'Neil
woneil@winston.com

Kenneth Suh
kennethsuh@quinnemanuel.com

I also certify that I arranged for a courtesy copy of same to be delivered to chambers pursuant to applicable local rule.

/s/ Lisa L. Clay