# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC,         ) | |
|         Plaintiff,         ) | |

G&G CLOSED CIRCUIT EVENTS, LLC,   )
     Plaintiff,    )
   v.        )
JAIME F. CASTILLO, MARIA A. CASTILLO, and )
EL BAJIO ENTERPRISES, INC.,    )
     Defendants.   )
_____)
JAIME F. CASTILLO, MARIA A. CASTILLO, and )
EL BAJIO ENTERPRISES, INC., on behalf of  )
themselves and others similarly situated,   )
     Counter-Plaintiffs,  )
   v.        )  Case No. 14-CV-02073
G&G CLOSED CIRCUIT EVENTS, LLC,   )
     Counter-Defendant.  )  Judge Joan B. Gottschall
_____)
JAIME F. CASTILLO, MARIA A. CASTILLO, and )
EL BAJIO ENTERPRISES, INC., on behalf of  )
themselves and others similarly situated,   )
     Third-Party Plaintiffs, )
   v.        )
DIRECTV INTERNATIONAL, INC., DIRECTV, LLC, )
and THE DIRECTV GROUP,    )
     Third-Party Defendants. )
_____)
JAIME F. CASTILLO, MARIA A. CASTILLO, and )
EL BAJIO ENTERPRISES, INC., on behalf of  )
themselves and others similarly situated,   )
     Third-Party Plaintiffs, )
   v.        )
LAW OFFICES OF THOMAS P. RILEY,   )
     Third-Party Defendant. )
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

For nearly three years, the parties have been sparring over alleged violations of the

Communications Act of 1934 ("the Communications Act"), 47 U.S.C. § 605, and the Cable and

Television Consumer Protection and Competition Act of 1992, as amended, 47 U.S.C. § 553.

The plaintiff, G&G Closed Circuit Events, LLC ("G&G"), filed a two-count complaint alleging

that Jaime Castillo ("J. Castillo"), Maria Castillo, and El Bajio Enterprises, Inc., doing business as La Pena Restaurante ("La Pena") (collectively "the Castillos") showed a pay-per-view boxing match at La Pena on April 20, 2013, without proper authorization from G&G. (*See* ECF No. 1 ¶¶ 17–29.) As the pleadings stand now, the Castillos assert class action counterclaims against G&G and a third-party class action against an attorney who has represented G&G, Law Offices of Thomas P. Riley ("Riley"), alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). The Castillos also received leave to bring a third-party class action complaint alleging ICFA violations against DirecTV International, Inc.; DirecTV, LLC; and the DirecTV Group, Inc. (collectively "DirecTV"). (ECF No. 180.)

A number of motions are before the court, but only one is a contender right now: DirecTV's motion to compel arbitration of the Castillos' third-party claims against it. For the following reasons, the court grants that motion and stays this action pending arbitration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In their counterclaims and third-party claim against Riley, the Castillos claim that Aaron Lockner ("Lockner"), an investigator subcontracted by a private investigative agency with which Riley contracted, entrapped J. Castillo into turning on the pay-per-view fight at La Pena by specifically asking him to change the channel to the fight by specifying a channel number. (*See* 3d Am. Class Action Countercl. ¶¶ 18–26, ECF No. 178.) J. Castillo, Lockner, and the other patrons present could see the fight on Showtime without a pay-per-view warning because DirecTV had, according to the Castillos, "intentionally set up an improper residential account in a commercial establishment." (*Id.* ¶ 28.) The Castillos claim that G&G, Riley, and their agents

operate a scheme whereby they exploit the fact that DirecTV sets up many minority-owned businesses with residential accounts without the owners' knowledge. G&G, Riley, and their agents then send demand letters, wearing the owner down, in the hope of winning a large, unjustified settlement.

That is what the Castillos claim occurred in their case. In their third-party claim against DirecTV and their class action allegations, the Castillos trace the origin of their dispute with G&G to the installation of J. Castillo's DirecTV service at La Pena. J. Castillo alleges the installation occurred in or around November 2011, though DirecTV disputes that date. In their first amended third-party complaint, the Castillos plead that no one could mistake La Pena for a residence, yet the third-party installer who installed J. Castillo's DirecTV service told him that the federal employer identification number he provided "was not working" and asked for J. Castillo's personal information. (ECF No. 180 ¶ 15.) J. Castillo "thought nothing of the request" and gave the installer his personal credit card number and driver's license. (*Id.* ¶ 16.) He "did not know, and had no reason [to] suspect, that the DirecTV representative had created a residential and not a commercial account." (*Id.* ¶ 17.) The third-party complaint also alleges that J. Castillo was not provided a copy of a Customer Agreement for his account. (*Id.* ¶ 20.) He first learned he had a residential, rather than commercial, account over a year after G&G sued him, according to the third-party complaint. (*Id.* ¶ 22.) As the third-party complaint states, "Lockner [the investigator] was only able to trick Jaime into turning on the Fight, and the Fight was only visible in La Pena because DirecTV had intentionally set up an improper residential account in a commercial establishment." (*Id.* ¶ 42.)

The Castillos acknowledge two changes to J. Castillo's DirecTV service during the relevant timeframe. First, J. Castillo ordered an "upgraded receiver" on or around March 30,

2013, but it came with bundled channels, including Showtime, that he neither wanted nor needed.  (*Id.* ¶ 26).  J. Castillo also contacted DirecTV in May 2013 "prior to learning of the instant claims by G&G . . . to discuss 'canceling premiums' because he was interested in more and better sports programming."  (*Id.* ¶ 44.)

Here is how the case stands.  This case was referred to the assigned magistrate judge for discovery supervision and settlement conference pursuant to Local Rule 72.1 and 28 U.S.C. § 636(b).  (*See* ECF Nos. 38, 39.)  On November 2, 2016, the magistrate judge eventually set March 1, 2016, as the deadline for completing all discovery.  (ECF No. 61 at 1.)  The magistrate judge denied a motion to extend discovery filed by the Castillos, and they have moved to set the magistrate judge's order aside pursuant to Federal Rule of Civil Procedure 72.

This court granted the Castillos leave to file their most recent round of live pleadings on April 27, 2016.  (ECF No. 169 at 1.)  They filed their live pleadings on May 11, 2016.  (ECF Nos. 178–80.)  DirecTV moved to compel arbitration on May 26, 2016.  (ECF No. 183.)

G&G then moved to knock out the Castillos' counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 214.)  The Castillos countered with a motion for summary judgment on G&G's Communications Act claim.  (ECF No. 229.)  Meanwhile, Riley moved to dismiss the third-party complaint against him under Rule 12(b)(6).  (ECF No. 219.)  In September 2016, G&G filed a motion for sanctions against the Castillos and their counsel, arguing that the Castillos' third amended counterclaim made inappropriate allegations in light of the discovery that had occurred.  (ECF No. 235.)  G&G followed up with a motion for summary judgment on the Castillos' liability to it under the Communications Act.  (ECF No. 251.)

## II. MOTION TO COMPEL ARBITRATION

Invoking the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1–16, DirecTV moves to compel the Castillos to arbitrate their third-party claims pursuant to their Customer Agreement (*e.g.*, Decl. of Ivy S. Rankin Ex. 5, ECF No. 185) and for a stay. The Castillos respond that: (1) DirecTV has produced insufficient evidence that it sent J. Castillo a copy of the Customer Agreement before his claims arose; (2) this dispute falls into an exclusion in § 9(d) of the Customer Agreement; and (3) the Customer Agreement is procedurally and substantively unconscionable. The court addresses the scope of the arbitration clause first because the Castillos argue that regardless of whether they are bound by the clause, this dispute lies beyond its scope.

### A. Legal Standard

Under the FAA, a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "places arbitration contracts 'on equal footing with all other contracts;'" no more, no less. *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (quoting same source). Once the court is "satisfied that issue involved in [a] suit is referable to arbitration," the court must, "on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3; *accord Achey v. BMO Harris Bank, N.A.*, 64 F. Supp. 3d 1170, 1175 (N.D. Ill. 2014) (citing *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 786 (N.D. Ill. 2011)).

Three elements must be present before a court can compel arbitration: "[1] a written agreement to arbitrate, [2] a dispute within the scope of the arbitration agreement, and [3] a

refusal to arbitrate." *Pearson v. United Debt Holdings, LLC*, 123 F. Supp. 3d 1070, 1073 (N.D. Ill. 2015) (quoting *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)) (brackets in original). Analysis of whether these elements exist "mirrors summary judgment analysis." *Id.* (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)); *see also* 9 U.S.C. § 4; *Johnson v. Orkin, LLC*, 928 F. Supp. 2d 989, 1001 (N.D. Ill. 2013) ("[T]he party opposing compelled arbitration will fail if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." (internal quotation marks, ellipsis, and citation omitted)).

**B. The Third-Party Claim Falls Within the Scope of the Arbitration Clause**

When evaluating the scope of an arbitration clause, arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *IBEW Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (quotation omitted); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960). "Once it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) and *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998)); *Johnson*, 928 F. Supp. 2d at 1002 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25). Nevertheless, the parties remain free to create exceptions to arbitration clauses, and exceptions will be enforced in a manner consistent with the parties' intent. *See Panoramic Stock Images, Ltd. v. John Wiley & Sons, Inc.*, 963 F. Supp. 2d 842, 848 (N.D. Ill. 2013) ("arbitration carve-outs are permitted as a general rule . . ." (citing *Navistar Int'l*

*Corp. v. Fernandez*, 2011 IL App (2d) 100268-U (Ill. App. Ct. Aug. 23, 2011) and *Williams v. TCF Nat'l Bank*, 2013 WL 708123, at *11–12 (N.D. Ill. Feb. 26, 2013)).

In Illinois, "the objective in interpreting a contract is to ascertain and give effect to the intent of the parties." *Carey v. Richards Bldg. Supply Co.,* 856 N.E.2d 24, 27 (Ill. App. Ct. 2006). Under Illinois law, the court "must interpret the words of the contract with their common and generally accepted meanings" and "construe the words of a contract within the context of the contract as a whole." *Davis v. Fenton*, 26 F. Supp. 3d 727, 736 (N.D. Ill. 2014) (quoting *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. Ct. 2005)).

With those principles in mind, the court turns to Section 9 of DirecTV's Customer Agreement:

> 9. RESOLVING DISPUTES
>
> In order to expedite and control the cost of disputes, you and we agree that any legal or equitable claim relating to this Agreement, any addendum, or your Service (referred to as a "Claim") will be resolved as follows:
>
> (a) Informal Resolution. We will first try to resolve any Claim informally. Accordingly, neither of us may start a formal proceeding (except for Claims described in Section 9(d) below) for at least 60 days after one of us notifies the other of a Claim in writing. . . .
>
> (b) Formal Resolution. Except as provided in Section 9(d), if we cannot resolve a Claim informally, any Claim either of us asserts will be resolved only by binding arbitration. The arbitration will be conducted under the rules of JAMS that are in effect at the time the arbitration is initiated (referred to as the "JAMS Rules") and under the rules set forth in this Agreement. . . .
> . . .
>
> (d) Exceptions. Notwithstanding the foregoing: (i) any Claim based on Section 1(h) above, and (ii) any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. § 605, the Digital Millennium Copyright Act, 17 U.S.C. § 1201, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 or any other statement or law governing theft of service, may be decided only by a court of competent jurisdiction. You may also

assert an individual action in small claims court in lieu of arbitration.[1]

(Rankin Decl. Ex. 5, ECF No. 185-5.)

The Castillos focus on the breadth of the words "any dispute involving" in § 9(d). (*See* Resp. to Mot. to Compel Arbitration 8, ECF No. 203.) They argue that § 9(d) uses language broad enough "to encompass a dispute between multiple parties that involves §605 in any way," but they read the words "any dispute involving" in isolation from the rest of the arbitration clause. (*Id.*)

In context, § 9 of the Customer Agreement requires the dispute between the customer and DirecTV, as contrasted with someone else, to involve the Communications Act. A contract's plain language "read in context, is the best evidence of [the parties'] intent." *State Farm Mut. Auto. Ins. Co. v. Electrolux Home Prods., Inc.*, 891 F. Supp. 2d 906, 910 (N.D. Ill. 2012) (citing *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)) (construing arbitration provisions of insurance contract); *see also Asta, L.L.C. v. Telezygology, Inc.*, 629 F. Supp. 2d 837, 844 (N.D. Ill. 2009) ("the meaning of any word 'cannot be determined in isolation but must be drawn from the context in which it is used'" (quoting *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace & Agric. Implement Workers of Am., Int'l . Union*, 523 U.S. 653, 657 (1998)) (other citation omitted)).

Subsection 9(a) begins, "Except as provided in Section 9(d), if we cannot resolve a Claim informally . . . ." § 9(a). Section 9(b) then submits disputes that cannot be resolved informally to arbitration, and it also specifies the relationship between it and the exception in § 9(d). Again,

---

[1] One version of the Customer Agreement does not contain the final sentence of § 9(d). (*See* Rankin Decl. Ex. 2 at 1.) The Castillos briefly argue that their right to bring an action in small claims court makes the Customer Agreement unconscionable because the class action device is unavailable in small claims court. They cite nothing for this argument, and the court finds it to be waived. Thus, the court need not decide whether Illinois has such a rule, and if so, whether the FAA would preempt it under the Supreme Court's decision in *Concepcion*. *See Concepcion*, 563 U.S. at 341–52 (holding FAA preempted California rule that agreements to arbitrate without a class action carve-out are unconscionable).

§ 9(b) uses the word "we": "Except as provided in Section 9(d), if *we* cannot resolve a Claim informally . . . ." (emphasis added). Combine § 9(b)'s cross reference with the Communications Act exclusion in 9(d), and the exclusion's context becomes clear: "If we cannot resolve a claim informally, . . . any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. § 605 . . . may be decided only by a court of competent jurisdiction." That is, the Customer Agreement provides that a "dispute" excluded in § 9(d) must be one "we cannot resolve informally," necessarily implying that it must be one that "we (meaning the parties to the Customer Agreement) can[ ] resolve" at all. And for that to be possible and the dispute to be excludable under § 9(d), the dispute must be between the parties to the Customer Agreement. *See State Farm*, 891 F. Supp. 2d at 910–11 (reading terms of arbitration provision together to find that "the parties agreed only to arbitrate those claims that were processed in a certain manner"); *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 925 (N.D. Ill. 2007) (rejecting parties construction of phrase because "the language . . . , when read in context, applies only within the first six months of the contract").

As a result, to say, as the Castillos do, (Resp. to Mot. to Compel Arbitration 7–8, ECF No. 203) that they would not have needed to filed a third-party claim against DirecTV but for G&G bringing a Communications Act claim against them shows why they initiated a dispute with DirecTV, but it does not mean that the dispute between them and DirecTV necessarily involves the Communications Act. Indeed, the Castillos' amended third-party complaint mentions the Communications Act only once–and that mention disclaims the Castillos' standing to bring Communications Act claims against DirecTV for allegedly entrapping them. (*See* ECF No. 180 at 10 n.4.) The Castillos complain of DirecTV's alleged practices of setting up residential accounts for commercial customers; failing to send contracts and documents setting

9

forth the material terms of their agreements; not giving customers adequate information about, or notice of, promotions; failing to monitor the work of installers; and failing to give customers "basic information about their own accounts." (*Id.* ¶ 67) Those alleged violations of Illinois consumer protection law do not facially implicate the Communications Act. *See Joaquin v. DirecTV Group Holdings*, Civil Action No. 15-8194 (MAS) (DEA), 2016 WL 4547150, at *6 (D.N.J. Aug. 30, 2016) (holding that § 9(d)'s exclusion did not apply to complaint bringing similar claims under New Jersey Consumer Fraud Act, that state's RICO statute, and common law fraud where allegations "center[ed] around an alleged 'scheme and course of conduct in which the owners of small businesses ... (often minorities ...) are the focus of unsolicited sales campaigns to sell satellite cable television services' and then 'send legal correspondence to the business owners which allege that they have 'pirated' or stolen [the] services.'") (alterations in original). As the third-party complaint expressly disclaims the Castillos' standing under the Communications Act to advance the Castillos' entrapment theory, that theory, if actionable, implicates consumer protection law, and so the Castillos have initiated a dispute with DirecTV that does not "involve a violation of the Communications Act" as that phrase is used in § 9(d) of the Customer Agreement. *See id.*

The Castillos also point to several cases involving other parties in which DirecTV was joined as a third-party defendant but did not file a motion to compel arbitration, a fact the Castillos take as a concession that § 9(b) did not apply. (Resp. to Mot. to Compel Arbitration 7 (collecting cases).) The Castillos cite no authority for the proposition that forfeiture or waiver occurs in these circumstances, and at least one judge of this court has found no authority for the proposition "that failure to make an [arbitrability] argument in a past suit amounts to forfeiture of the same argument in a later suit or a tacit agreement that the other side's position in the earlier

suit will govern later suits." *Exelon Generation Co. v. Local 15, IBEW*, 140 F. Supp. 3d 751, 758 (N.D. Ill. 2015) (rejecting argument that same parties' decision to submit prior suits to judicial resolution precluded party from seeking to compel arbitration). The Castillos have therefore failed to carry their burden of persuasion on this argument.

Especially given the FAA's rule that doubts about an arbitration clause's scope must be resolved in favor of arbitrability, the Castillos' third-party claims fall within the scope of the Customer Agreements' arbitration clauses. *See NextEra Energy*, 762 F.3d at 594 ("[W]here any ambiguity as to the scope of the clause exists, we will construe it in favor of the party seeking arbitration." (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 475–76 (1989))). The court recognizes that enforcing this arbitration clause will impact G&G, Riley, and the nonparties who have been swept into this litigation, but "[u]nder the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Ferenc v. Brenner*, 927 F. Supp. 2d 537, 547 (N.D. Ill. 2013) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20) (brackets in original)) (making this point when enforcing arbitration clause despite the pendency of RICO claims filed by nonparty to the agreement to arbitrate); *see also KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) (per curiam) ("The [FAA] has been interpreted to require that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." (citation omitted)).

## C. An Enforceable Written Agreement to Arbitrate Exists

As with any contract, state law determines whether an agreement to arbitrate is enforceable. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (stating in FAA case in which plaintiff challenged agreement's enforceability that "contract formation is

governed by state law" (citations omitted)); *Dorsey v. H.C.P. Sales, Inc.*, 46 F. Supp. 2d 804, 807 (N.D. Ill. 1999) ("We treat an agreement to arbitrate like any other contract, and look to state law to determine whether an arbitration clause is enforceable." (citing *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366–67 (7th Cir. 1999)). When looking at formation, "the FAA's policy in favor of arbitration applies when determining the *scope* of an agreement to arbitrate, but not when deciding whether there is an agreement to arbitrate in the first instance." *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)). The Customer Agreement includes a clause selecting "the laws of the state and local area where service is provided to you," (§ 10B), and DirecTV and the Castillos apply Illinois law to the agreement in their briefing. Following the command of the Customer Agreement, the court applies Illinois law here. *See LaSalle Bank Nat'l Ass'n v. Paramont Props., LLC*, 588 F. Supp. 2d 840, 849 (N.D. Ill. 2008) (applying Illinois law and giving effect to unchallenged choice-of-law clause in contract); *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 948 (N.D. Ill. 2006) (same).

The initial dispute here concerns the Castillos' assent to the arbitration clause in the Customer Agreement. "Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016) (citing *Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016)) (other citations omitted).

To prove that the Customer Agreement existed, DirecTV submits three affidavits and copies of versions of its customer agreement it has adopted over the years containing identical arbitration clauses. (*See* Rankin Decl. Ex. 2, 5, 8 10; *see also* Decl. of Lisa L. Clay ¶¶ 2-3, ECF No. 203-2 (averring terms are identical).) According to one of DirecTV's declarations, it "sends

the Customer Agreement then in effect to new customers shortly after they sign up for service and to existing customers whenever the Customer Agreement is updated." (Rankin Decl. ¶ 4.) The Castillos dispute the date they first activated DirecTV service, but they put the activation at no later than 2011 (DirecTV claims J. Castillo's account was activated in June 2010). According to DirecTV, it uses different methods for providing copies of the Customer Agreement to its customers. "The manner in which individual customers have received copies of the Customer Agreement varies depending on whether the customer is a new or existing customer and whether the customer receives paper or electronic bills." (*Id.*) DirecTV sent Castillo an order confirmation letter and a copy of the Customer Agreement then in effect (*id.* Ex. 5) on or after March 30, 2013, after he placed an order for new equipment (Rankin Decl. ¶¶ 12–13). Additionally, the Customer Agreement changed twice between June 2010 and March 30, 2013, and DirecTV's "custom and practice" was to send customers like Castillo a copy. (Rankin Decl. ¶ 14.) DirecTV updated its agreement twice more before Castillo cancelled one of his accounts in June 2015, and DirecTV's "custom and practice" would have been to send him a copy. (*Id.* ¶¶ 15–16.)

Finally, DirecTV proffers evidence that "[f]rom December 2013 through at least November 2015" monthly invoices sent to J. Castillo for his commercial account stated that:

> You received your DirecTV Commercial Viewing Agreement with your contract. The Commercial Viewing Agreement describes the terms and conditions upon which you accept our service. Please consult the Commercial Viewing Agreement for complete information about billing and payment on your account." Each of these monthly invoices also stated under the heading "Errors or Questions About Your Invoice" that any claims about the invoice that cannot be resolved informally "may be resolved only through binding arbitration, as provided in the Commercial Viewing Agreement.

(Decl. of Alisa D. Kellogg ¶ 4 & Ex. 2, ECF No. 186.)

J. Castillo counters with his self-styled declaration. He states that the installer who set up his DirecTV service did not give him a written customer agreement (ECF No. 203-1 ¶ 4; *see also* Resp. to Mot. to Compel Arbitration 5, ECF No. 203 (clarifying that declaration refers to written agreement)); that DirecTV never sent him an agreement (ECF No. 203-1 ¶ 5); and that he has "no recollection of ever receiving a copy of a customer agreement" (*Id.* ¶ 6).

J. Castillo's declaration is not an adequate affidavit, however. It begins, "Jaime F. Castillo, being first duly sworn on oath, states as follows," (ECF No. 203-1 at 2), but it includes no notary public's seal or other evidence that it "was sworn to before someone qualified to administer oaths." *Home Sav. of Am., F.A. v. Einhorn*, No. 87 C 7390, 1990 WL 114643, at *1, *4 (N.D. Ill. July 24, 1990) (finding purported affidavit defective because it lacked notary public's seal and recited only that its maker "being sworn on oath hereby states"). Nor does it include any recitation at all in the form required by 28 U.S.C. § 1746, which permits the use of an unsworn declaration in federal court that is subscribed by its maker with a statement "in substantially the following form: . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.'" 28 U.S.C. § 1746(2) (West 2017) (applying to declarations made in the United States). J. Castillo's declaration states that his attorney drafted it. *Id.* at 3. His attorney's declaration accompanying the same motion includes a statement complying with § 1746. (Decl. of Lisa Clay 4, ECF No. 203-2). Because the Castillos' counsel apparently knows how to comply with § 1746, the absence of language subjecting Castillo to the penalties of perjury in his declaration seems to be a matter of conscious choice on this record. *See Trapaga v. Cent. States Joint Bd. Local 10*, No. 05 C 5742, 2007 WL 1017855, at *3 (N.D. Ill. Mar. 30, 2007) (enforcing requirements of § 1746 in part because "each affidavit state[d] that it was prepared by Plaintiffs' counsel, who acknowledges in his response to Defendant's motion

to strike that he personally drafted the affidavits and deliberately chose [their] language").

Accordingly, the court disregards J. Castillo's declaration. *See Trapaga*, 2007 WL 1017855, at

*6 (discounting affidavit that included no § 1746 statement and began by stating, "on my oath

and under penalty of the law that the following is the truth," because that statement did not show

clearly the declarant's awareness of the penalty of perjury); *Home Sav. of Am.*, 1990 WL 114643,

at *4 (finding purported affidavit insufficient because it lacked § 1746 statement and did not

show that the person before whom it was sworn was authorized to administer oaths).

Regardless of the admissibility of his declaration, J. Castillo "does not dispute that he was

provided access to a customer service agreement related to DirecTV Account 2" in May 2013.[2]

(Resp. to Mot. to Compel Arbitration 5 (citing purported declaration) (emphasis omitted)).  J.

Castillo contends that his claims against DirecTV do not concern that account and instead

involve an installation that occurred years earlier.  (*See id.*)  At most, J. Castillo disputes when he

---

[2] DirecTV maintains that there is no genuine dispute that it mailed copies of the Customer Agreement to J. Castillo when he opened his account and on two additional occasions before 2013, but the matter does not appear so straightforward.  Even if it were it admissible, J. Castillo's statement in paragraph six that DirecTV did not send him an agreement opines in conclusory fashion without an evident basis for personal knowledge; it does not create a fact issue.  *See, e.g.*, *Harris v. AC & S, Inc.*, 915 F. Supp. 1420, 1432 (S.D. Ind. 1995) ("Conclusory statements or indications of opinion or belief offered without any factual support are also insufficient to create a genuine issue of fact." (citing *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992)) (other citations omitted)).  Nor does his statement that he does not remember receiving a written customer agreement.  A witness's inability to recall something will not create a fact issue in the face of affirmative evidence of the fact.  *See Clark v. Takata Corp.*, 192 F.3d 750, 761 (7th Cir. 1999) (discussing rule that "at some point a party who discounts his knowledge of a certain subject cannot create a 'genuine' issue of fact by contradicting unequivocal testimony about the subject," thereby recognizing that testimony of lack of recollection does not itself create a fact issue (quoting *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993)); *Sprague v. Navistar Int'l Transp. Corp.*, 838 F. Supp. 1268, 1271 n.6 (N.D. Ill. 1993) (holding evidence that witness could not recall conversation did not create genuine fact dispute over conversation's contents).  Nevertheless, DirecTV's suggestion that its "custom and practice" evidence should be admitted under Federal Rule of Evidence 406 seems dubious given the perfunctory fashion in which the existence of persistent practice is asserted in Rankin's declaration.  *See generally Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290, 1296 (7th Cir. 1988) ("before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." (citations omitted)).

was sent notice pointing him to the Customer Agreement in its entirety, not that he never received notice of where the Customer Agreement could be found. He undisputedly continued to use DirecTV's services for years after receiving access to the Customer Agreement in May 2013. The record shows that he knew how to cancel service because he cancelled one of his DirecTV accounts. (*See* Kellogg Decl. ¶ 3, ECF No. 186.) His continued use of DirecTV's services for years after receiving access to the Customer Agreement constituted assent. *See James v. McDonald's Corp.*, 417 F.3d 672, 673, 677–78 (7th Cir. 2005) (holding plaintiff assented to be bound rules of promotional contest, including arbitration clause, when she purchased French fries at fast food restaurant without reading rules); *Boomer v. AT & T Corp.*, 309 F.3d 404, 415–17 (7th Cir. 2002) (holding consumer who had meaningful opportunity to reject offer assented to arbitration provision by continuing to use telephone service); *see also Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1105 (C.D. Cal. 2002) (enforcing arbitration clause and declining to resolve dispute over the amount of time between purchasing services and sending notice because "[t]he more controlling issue is the economic and practical considerations involved in selling services to mass consumers which make it acceptable for terms and conditions to follow the initial transaction").

The FAA allows parties to agree to arbitrate an "existing controversy." 9 U.S.C. § 2. The Castillos trace the factual background of their third-party claims against DirecTV to the installation of J. Castillo's DirecTV account in 2010 or 2011, but they confuse the factual basis for their dispute with the date on which a controversy involving those facts erupted with DirecTV. As the Castillos put it, assuming their version of the facts, "DirecTV's intentional installation and programming errors would have not mattered if agents of G&G Closed-Circuit Events had not tricked Jaime into turning on a boxing match at La Pena on the night of April 20,

2013." (Resp. to Mot. to Compel Arbitration 6.) Even then, they cite no evidence that a dispute with DirecTV had yet emerged. (*See id.* at 5–6.) Instead, the Castillos' dispute with DirecTV only erupted after G&G sued DirecTV. (*Id.* at 7 ("The Castillos would have no reason to have filed claims against DirecTV in this litigation but for the claims alleged against them . . . ." (emphasis omitted)).) That puts the inception of the Castillos' dispute with DirecTV, as contrasted with the factual basis for it, in 2015 when this action was commenced, two years after J. Castillo admits he received notice sufficient to apprise him of the Customer Agreement's arbitration clause. And J. Castillo does not dispute that he continued to receive DirecTV service as recently as 2015. Every Customer Agreement in the record submits "any legal or equitable claim relating to . . . your Service" (*e.g.*, Rankin Decl. Ex. 2 § 9) to arbitration without a qualification about when the dispute emerged. As parties are free to agree to arbitrate a future dispute, J. Castillo's assent to the arbitration clause by no later than 2013 made the clause enforceable when a dispute broke out in 2015. *See, e.g.*, *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (enforcing arbitration clause even though contract had expired, stating that "[i]f the parties had wished to limit the duty to arbitrate to the term of the Agreement itself they could have said so explicitly. Instead, they used language that evinces an intent to commit to arbitration any dispute connected with the contract irrespective of when it occurs."); *but see Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205–06 (1991) (holding dispute arises under contract when "it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where . . . the disputed contractual right survives expiration of the remainder of the agreement").

**D. The Castillos Have Not Shown That the Arbitration Clause Is Unconscionable**

Relying on *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008), the Castillos repackage their argument about G&G's evidence that J. Castillo was sent a written copy of the Customer Agreement under Illinois' procedural unconscionability doctrine. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Jackson v. Payday Fin., LLC*, 764 F.3d 766, 777 (7th Cir. 2014) (quoting *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006)). Relevant considerations "include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Id.* at 778 (quoting *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 648 (Ill. 2011)).

In *Trujillo*, the plaintiff bought a cell phone at a store; his receipt stated that he would be charged a ten percent restocking fee if he returned it and the box had been opened. 578 F. Supp. 2d at 982. The evidence showed that the store from which the plaintiff purchased the phone did not have copies of the written terms of service of AT&T, the company providing exclusive cellular service for the phone. *Id.* at 983. AT&T later tried to enforce an arbitration clause in those terms, but the *Trujillo* court, distinguishing *Bess v. DirecTV, Inc.*, 885 N.E.2d 488 (Ill. App. Ct. 2008), reasoned that the plaintiff could not "unwind the earlier purchase" of the cell phone (as far as he knew from the receipt) and reject the provider's arbitration clause without incurring the ten percent restocking fee. *See id.* at 993.

Unlike the plaintiff in *Trujillo*, the Castillos identify no extra costs they would have incurred had they chosen to cancel their DirecTV service because they rejected the arbitration

clause when they became objectively aware of it no later than in 2013. Thus, they stand on the same footing as the plaintiff in *Bess*, "in which the plaintiff, had she chosen not to accept the belatedly-produced agreement, would have incurred no expense," *Trujillo*, 578 F. Supp. 2d at 993 (characterizing *Bess*'s holding). So, the result in *Bess*, enforcement of the clause, obtains here. *See also Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) (enforcing arbitration clause even though it came in box with item where agreement allowed customer to return computer without paying a penalty).

Even as they seek shelter in it, the Castillos also claim that the Customer Agreement's exception for disputes involving, among other things, the Communications Act is so one-sided that it is substantively unconscionable. Substantive unconscionability doctrine "examines the relative fairness of the obligations assumed." *Jackson*, 764 F.3d at 778 (quoting *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006)). "[C]ontract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity" all can indicate substantive unconscionability. *Id.* (quoting *Kinkel*, 857 N.E.2d at 267).

The Castillos maintain that the Customer Agreements' arbitration clauses give DirecTV all the advantage, allowing it to go to federal court to protect its rights in theft-of-service cases while customers like the Castillos have to arbitrate any claim they realistically have. (Resp. Mot. to Compel Arbitration 12.) That contention cannot be squared with § 9(d)'s exclusion of "any dispute" without reference to which party initiates it. *See Gore*, 666 F.3d at 1034 (stressing the breadth of an arbitration clause submitting "[a]ny dispute arising out of this agreement or relating to the services and equipment" to arbitration) (alteration in original). District courts have upheld § 9 of DirecTV's Customer Agreement against substantive unconscionability challenges because

"'it is conceivable that a [customer] might have a claim against' DirecTV for . . . claims" under the laws listed in § 9(d).[3] *Hodsdon v. DirecTV, LLC*, No. C 12-02827 JSW, 2012 WL 5464615, at *6–7 (N.D. Cal. Nov. 8, 2012) (quoting *In re DirecTV Early Cancellation Fee Mktg. and Sales Practices Litig.*, 810 F. Supp. 2d 1060, 1069 (C.D. Cal. 2011)) (applying California law) (brackets in original); *see also Bischoff*, 180 F. Supp. 2d at 1112 (same). Finally, the Customer Agreement incorporates JAMS rules expressly (*see* § 9(b)), so customers like "the Plaintiffs [can] ascertain the dispute resolution processes and rules to which they were agreeing." *Jackson*, 764 F.3d at 778 (finding arbitration clause unconscionable because the contract incorporated arbitration rules that did not exist). Accordingly, the Castillos have not demonstrated that the Customer Agreement's arbitration clause is substantively or procedurally unconscionable.

## E. The Nonarbitrable Claims Should Be Stayed

As to the Castillos' third-party claims against DirecTV, the three ingredients needed to compel arbitration under the FAA are present: a valid agreement to arbitrate, a dispute within the scope of the arbitration clause, and a demand for arbitration. Therefore, the FAA requires the court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. But what about G&G's claims, the Castillos' counterclaims, and their third-party claims against Riley?

---

[3] The cases interpreting DirecTV's Consumer Agreement cited in the text do not offer any concrete examples of the sort of claim a consumer could bring under the exception in § 9(d). Nevertheless, the Seventh Circuit has more than once upheld provisions carving out one-sided exceptions to arbitration clauses against unconscionability challenges. *See Oblix, Inc. v. Winiecki*, 374 F.3d 488,490–91 (7th Cir. 2004) (applying California law and rejecting argument that exception to employment agreement's arbitration clause that allowed employer to sue the employee for theft of trade secrets but required employee to arbitrate employment-related claims render the clause unconscionable in one sentence: "That [the employer] did not promise to arbitrate all of its potential claims is neither here nor there."); *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999) (citing *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992)) (upholding franchise agreements and subleases against unconscionability challenge under Illinois law even though the agreements, read together, required the franchisee to arbitrate claims but permitted franchiser to take eviction claims to court).

"The decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket." *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 97 (4th Cir. 1996)) (discussing discretion and noting that "[t]he Supreme Court has indicated its support for this interpretation of § 3 on at least two occasions") (citations omitted); *see also French v. Wachovia Bank*, 574 F.3d 830, 834 (7th Cir. 2009) (reviewing decision staying nonarbitrable claims for abuse of discretion); *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997). The breadth of that discretion reaches its limits, however, when "allowing nonarbitrable issues to proceed in the district court, risks 'inconsistent rulings' because the pending arbitration is 'likely to resolve issues material to [the] lawsuit.'" *Volkswagen*, 474 F.3d at 972 (quoting *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 242 F.3d 777, 783 (8th Cir. 2001)). Section 3 of the FAA does not require a stay of nonarbitrable claims; rather, the exception involving potentially inconsistent rulings constitutes a specific application of the abstention doctrines that can be invoked whenever parallel legal or arbitral proceedings are pending. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529–30 (7th Cir. 1996) (citing, for example, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). In the context of parallel arbitration proceedings, this court must weigh "the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays." *Volkswagen*, 474 F.3d at 972 (quoting *AgGrow Oils*, 242 F.3d at 783) ("When these factors weigh in favor of staying the entire action pending arbitration, the district court may abuse its discretion in allowing the nonarbitrable issues to proceed absent a stay."). The Seventh Circuit has also noted that "district courts actually may prefer to stay the balance of the case in the hope that the arbitration might

help resolve, or at least shed some light on, the issues remaining in federal court." *Id.* (citing *Hikers Indus., Inc. v. William Stuart Indus. Ltd.*, 640 F. Supp. 175, 178 (S.D.N.Y. 1986)).

The parties do not discuss the factors the court must apply. DirecTV notes that this court has the power to stay the entire action in its memorandum in support of its motion to compel but does not comment on the propriety of a stay broader than its third-party claims. (*See* ECF No. 184 at 13.) The Castillos do not address the scope of the stay in their response (ECF No. 203). Nor has any other party weighed in on this issue. Their failure to do so can be construed as forfeiture. *Cf. Panoramic Stock Images*, 963 F. Supp. 2d at 848 (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) and *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407–08 (7th Cir. 2007)) (holding that party forfeited argument by failing to respond to it in reply brief).

A substantial risk of inconsistent rulings on a factual question central to the dispute between, at least, G&G and the Castillos exists here. A review of the summary judgment briefing reveals that G&G and the Castillos dispute whether "DirecTV provided these Defendants a residential account in their establishment without their knowledge or consent" and whether that fact is material to § 605 liability, damages, or both; in fact, the Castillos argue that if anyone is liable to G&G for a Communications Act violation, it is DirecTV. (*Compare* Defs.' Mem. Supp. Mot. Summ. J. or Alternative Mot. Partial Summ. J. 7–8, ECF No. 203; *and* Defs.' Rule 56.1 Stmt. ¶ 44, ECF No. 231 (arguing that the "only reason G&G's agent auditor/investigator Lockner was able to request the Fight is that satellite provider DirecTV had, without Jaime or Maria's knowledge, installed residential programming at La Pena . . . ."), *with* Pl.'s Opp'n & Br. In Opp'n to Defs.' Mot. for Summ. J. 7–8, ECF No. 242 (describing fact as "very much disputed" and arguing that it is immaterial to liability); *and* Pl.'s Resp. to Defs.' Rule 56.1 Stmt. ¶ 44, ECF No. 243)). The same fact question rears its head in the motion for

sanctions, where it is described as "the crux" of the Castillos' Third Amended counterclaim (Br. Supp. Mot. Sanctions 11, ECF No. 240). Again, the Castillos challenge it in their response. (*See* Resp. 8–10, ECF No. 261). Closely related factual questions, though not the same legal questions, will be front and center in the arbitration. (*See* 1st Am. Class Action 3d Party Compl. ¶ 17, ECF No. 180 (alleging that J. Castillo "did not know, and had no reason or [sic] suspect, that the DirecTV representative had created a residential and not a commercial account")). So the arbitration of the Castillos' third-party claims against DirecTV "is 'likely to resolve issues material to [the] lawsuit,'" even if a disagreement exists on the question of which elements of the claims and defenses those questions are material. *Volkswagen*, 474 F.3d at 972 (quoting *AgGrow Oil*, 242 F.3d at 778) (alteration in original); *see also WMS Gaming, Inc. v. IGT,* 31 F. Supp. 3d 974, 979 (N.D. Ill. 2014) (staying action in its entirety and emphasizing that in *Volkswagen*, "the Seventh Circuit cautioned courts to avoid the risk of inconsistent rulings on arbitrable *issues*, not simply arbitrable claims") (other citation omitted); *Championsworld LLC v. U.S. Soccer Fed'n, Inc.*, No. 06 C 5724, 2008 WL 4861522, at *3 (N.D. Ill. Nov. 7, 2008) (acknowledging nonarbitrable RICO claims would not be resolved by resolution of arbitrable issues but staying all claims where arbitrable issues were "intertwined through all of Plaintiff's seven claims" and arbitrable issues would affect RICO damages); *Air Freight Servs., Inc. v. Air Cargo Transp., Inc.*, 919 F. Supp. 321, 325–26 (N.D. Ill. 1996) (staying nonarbitrable claims because "issues involving the 1992 Agreement[, which was arbitrable,] pervade[d] all of the counts of plaintiffs' complaint").

While the Castillos, G&G, and Riley certainly disagree about a host of things besides whether the Castillos' residential DirecTV account was set up without their knowledge or consent, it would be nearly impossible to proceed further without addressing that question and

thereby interfering with the arbitrator's prerogatives. When considering the extent to which the parties will be bound by the arbitrator's decision, the Seventh Circuit has adverted to the "potential for impairment of the issues before the arbitrator due to the collateral estoppel effect of the . . . litigation." *Volkswagen*, 474 F.3d at 972 (quoting and discussing *Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.*, 916 F.2d 402, 407 (7th Cir. 1990), *abrogated on other grounds by IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996), which reversed refusal to stay for abuse of discretion). Or, as the *IDS Life Insurance*, *supra*, court put it, stays have been upheld in "cases in which a party to an arbitration agreement, trying to get around it, sues not only the other party to the agreement but some related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration." 103 F.3d at 530. Similarly, in *AgGrow Oils*, the Eighth Circuit Court of Appeals observed that "[a]bsent a discretionary stay, [one of the parties to the litigation] will succeed in avoiding its duty to arbitrate performance issues under the Construction Contract" if the nonarbitrable lawsuit on a bond that raised common factual questions was not stayed. 242 F.3d at 783. These decisions teach that the point of asking whether failing to stay litigation will interfere with arbitration is ensuring that the arbitrator gets first priority to decide questions that a party has agreed to arbitrate; if proceeding in litigation would create a potentially embarrassing inconsistency with the arbitrator's decision on the issue, a stay should be used to allow the arbitrator to decide it. *See Volkswagen*, 474 F.3d at 972–73; *AgGrow Oils*, 242 F.3d at 783; *IDS Life Ins. Co.*, 103 F.3d at 530; *Morrie Mages*, 916 F.2d at 407. Seen from that vantage point, staying the nonarbitrable claims here will prevent the court from addressing factual issues the Castillos have agreed to present to an arbitrator.

Regarding prejudice from the delay, the court recognizes that the parties have invested no small amount of time and treasure in briefing the pending motions, but where, as here, the factual issues overlap, a stay will at most narrow their dispute. Furthermore, the Castillos chose to bring DirecTV into this litigation after discovery closed and to inject the closely related factual issues into the pending motions. The Supreme Court has expressly held that "the Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). Some of G&G and the Castillos' claims arise under federal law, but any interest this court has in adjudicating federal law claims must be protected through the proper application of collateral estoppel doctrine after the arbitration concludes. *See id.* at 221–22 (rejecting decisions of courts of appeal that held that arbitration should be stayed to protect federal courts' right to decide nonarbitrable claims under federal securities laws and stating that "the formulation of collateral-estoppel rules affords adequate protection to that interest.").

After weighing the possibility of inconsistent rulings, the extent to which the arbitrator would be bound, and the prejudice from delay, staying this action in its entirety is the appropriate course. On balance, allowing the arbitration to run its course has the added benefit of efficiently shedding light on the factual disputes in which G&G, the Castillos, and Riley are embroiled here. *See Volkswagen*, 474 F.3d at 972 (court may appropriately stay nonarbitrable claims to allow arbitration to "resolve, or at least shed some light on, the issues remaining in federal court" (citing *Hikers Indus.*, 640 F. Supp. at 178)).

## III. CONCLUSION

For the reasons given above, DirecTV's motion to compel arbitration (ECF No. 183) is granted. The Castillos and DirecTV are ordered to arbitrate the Castillos' third-party claims against DirecTV in accordance with § 9(b) of the Customer Agreement (Rankin Decl. Ex. 5, ECF No. 185-5.) This case is stayed in its entirety pending the resolution of the arbitration. Because the pending arbitration is likely to resolve issues the Castillos and G&G assert are material to their claims and counterclaims, the pending motions regarding those claims and counterclaims (ECF Nos. 214, 219, 229, 235, 251) are denied without prejudice and with leave to reinstate after the stay is lifted. In light of the stay, the Castillos' motion objecting to the magistrate judge's decision not to reopen discovery (ECF No. 132) is denied without prejudice.

The Castillos and DirecTV must file a status report on or before June 20, 2017.


Date:  March 22, 2017 _____/s/_____
Joan B. Gottschall
United States District Judge

26