|  |  |  |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| JAIME CASTILLO, MARIA CASTILLO, | ) | No. 14 C 2073 |
| and EL BAJIO ENTERPRISES, INC. | ) | |
| Defendants. | ) | Judge Edmond E. Chang |
| —————————————— | ) | |
| JAIME CASTILLO, MARIA CASTILLO, | ) | |
| and EL BAJIO ENTERPRISES, INC., | ) | |
| on behalf of themselves and others | ) | |
| similarly situated, | ) | |
| Counter-Plaintiffs | ) | |
| v. | ) | |
| LAW OFFICES OF THOMAS P. RILEY, | ) | |
| and | ) | |
| G&G CLOSED CIRCUIT EVENTS, LLC, | ) | |
| Counter-Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This is the latest installment in a years-long saga of litigation between Jaime

and Maria Castillo, El Bajio Enterprises,[1] G&G Closed Circuit Events (G&G for

short), and G&G's attorney, the Law Offices of Thomas P. Riley (Riley for short).

The conflict began when G&G accused the Castillos of unlawfully broadcasting a

_____

[1]For the sake of simplicity, the Court will refer to Jaime Castillo, Maria Castillo, and
El Bajio Enterprises collectively as "the Castillos."

boxing match at their restaurant in violation of G&G's exclusive commercial distribution rights.[2] When G&G's settlement demands proved futile, G&G initiated this lawsuit. R. 1, Compl.[3] The Castillos struck back with several counterclaims, the current version looping in Riley as a defendant. R. 178, Third Am. Counterclaim. At this point (after years of disputes over discovery and liability), G&G and the Castillos have both moved for summary judgment on the issue of the Castillos' liability for broadcasting the boxing match. R. 295, Castillo Mot. Summ. J.; R. 304, G&G Mot. Summ. J. Meanwhile, G&G and Riley have each moved to dismiss the Castillos' entire Third Amended Counterclaim. R. 293, G&G Mot. Dismiss; R. 300, Riley Mot. Dismiss. For the reasons stated below, the Castillos' motion for summary judgment is granted on G&G's claim under 47 U.S.C. § 553, but otherwise denied. G&G's motion for summary judgment is also denied. Both motions to dismiss are granted, and the Castillos' Third Amended Counterclaim is dismissed with prejudice.

## I. Summary Judgment Motions

### A. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Because G&G and the Castillos have both moved for summary judgment, the Court will consider the evidence in the light most favorable to each party to see if the opposing party is entitled to summary

---

[2]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.
[3]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

judgment.

G&G's version of events is that G&G owns the commercial distribution rights to a boxing match, *Saul Alvarez v. Austin Trout Championship Fight Program*, which was telecast nationwide on April 20, 2013. R. 306, G&G SOF ¶ 7.[4] The Castillos obtained access to the fight through their residential DirecTV account, and broadcast the fight at their restaurant, La Pena.[5] *Id.* ¶¶ 8-11. Aaron Lockner, an investigator working on behalf of G&G,[6] observed the fight through the window of La Pena, and went into the restaurant to investigate. R. 320, G&G Resp. Castillo SOF ¶ 46. Lockner wrote an affidavit stating that he saw the fight being displayed on three TVs in La Pena around 10:30 p.m. on April 20. G&G SOF Exh. 9, Lockner Aff. The Castillos did not order the fight from G&G, and did not obtain a commercial license to broadcast it. G&G SOF ¶ 12.

The Castillos admit that they showed the fight at their restaurant, and that they never purchased a commercial license from G&G. R. 324, Castillo Resp. G&G SOF ¶ 12; R. 297, Castillo SOF ¶ 42. But the Castillos maintain that they were

[4]Abbreviations to the parties' Local Rule 56.1 Statements are as follows: "Castillo SOF" for the Castillos' Statement of Facts [R. 297], "G&G SOF" for G&G's Statement of Facts in support of its own motion for summary judgement [R. 306]; "Castillo Resp. G&G SOF" for the Castillos' response to G&G's Statement of Facts [R. 324]; and "G&G Resp. Castillo SOF" for G&G's response to the Castillos' Statement of Facts [R. 320]; "G&G Add. SOF" for G&G's statement of additional facts in response to the Castillos' motion for summary judgment [R. 318]; and "Castillo Resp. G&G Add. SOF" for the Castillos' response to G&G's additional statement of facts in response to the Castillos' motion for summary judgment [R. 329].

[5]La Pena is the business name of El Bajio Enterprises. G&G SOF ¶ 2.

[6]Lockner was apparently hired by another investigator named Larry Biela, who was hired by G&G's attorney Thomas Riley. Castillo SOF ¶ 34; Castillo SOF Exh. 4, Riley Dep. 67:5-13. (G&G objected to this factual statement, but on grounds of relevance rather than factual accuracy. G&G Resp. Castillo SOF ¶ 34.)

entrapped into showing the fight by Aaron Lockner. *See* Castillo SOF ¶ 42. According to the Castillos, on the night of the fight, an unknown customer—who the Castillos now believe to be Lockner—asked Jaime Castillo to change the channel to Showtime to put on the fight. *Id.* The Castillos were able to show the fight because (they maintain), DirecTV had mistakenly installed residential programming at La Pena. *Id.* ¶ 43. (The fight was broadcast to residential customers at no charge on April 20, so the Castillos presumably were not prompted to pay for the programming when they put on the fight at Lockner's request. *See* Castillo SOF ¶¶ 44, 46.) The Castillos further assert that G&G encourages investigators like Lockner to engage in dishonest behavior by paying them only if they provide signed affidavits attesting to acts of piracy, by not double-checking the investigators' assertions in their affidavits, and by failing to verify other evidence provided by the investigators, such as photos and videos. Castillo SOF ¶¶ 30-33, 38.

### B. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make

credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## C. Analysis

### 1. G&G's Commercial Distribution Rights

A threshold dispute is whether G&G actually owns the commercial distribution rights to the Alvarez/Trout boxing match. G&G asserts that it purchased the rights from Showtime, and backs up this assertion with testimony from G&G's president Nicholas Gagliardi. G&G SOF ¶ 7; G&G SOF Exh 4, Gagliardi Dep. 21:5-23:1; R. 308, Gagliardi Aff. ¶ 3. The Castillos, on the other hand, argue that G&G's proof is insufficient to prove that G&G owns the commercial rights to the fight. *See* Castillo SOF ¶¶ 12-20; R. 296, Castillo Summ. J. Br. at 4. The Castillos do not provide any *evidence* to back up their suspicion that G&G does not own the rights to the fight, choosing to point only to oddities and inconsistencies in Gagliardi's testimony. *See id.*[7]

---

[7]It is passing strange that, for all the discovery skirmishes in this case, there is little or no actual, well, *discovery* taken on the issue of G&G's ownership of the commercial

Ordinarily, this kind of speculation about the truthfulness of the other side's testimony would not be enough to defeat a motion for summary judgment. *See, e.g.*, *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). In this case, however, there is some reason to be skeptical about Gagliardi's testimony. Gagliardi states that he negotiated purchase of the rights via email with someone named Jock McLean, who was then a vice president for sports and event programming at Showtime Networks, Inc. Gagliardi Aff. ¶ 3. Gagliardi testifies that it was the usual practice to not have a written contract. Castillo SOF Exh. 7, Gagliardi Dep. 22:2-5.

But Gagliardi was also unable to produce the emails that supposedly memorialized the agreement, or any other documentation to confirm that the sale actually took place. *See id*. 23:18-24:3. Gagliardi did explain the missing emails by testifying that his computer files got corrupted and the email was lost. *Id*. Gagliardi also testified that he tried to reach out to McLean, his contact at Showtime, and got no response. *Id*. 93:15-94:5. To be sure, none of this is a smoking gun. It could very well be true that Gagliardi's emails were indeed lost, and that McLean no longer works at Showtime or just refused to respond (though a subpoena would have required a response). Still, it is odd that G&G would have *no* documentation of its supposed rights to the programming. It is also strange that Gagliardi's emails were apparently stored only as files on one computer and could not be obtained from the

___

broadcast rights. For example, the parties have presented no evidence that Showtime was subpoenaed, by either side, for records or for a Rule 30(b)(6) deposition on the ownership issue.

provider of the email service. But, on the other hand, the Castillos provided no actual evidence to cast doubt on Gagliardi's testimony, even though they could presumably have backed up their theories by (as noted earlier) subpoenaing records from Showtime, for example. Even an *absence* of Showtime records would have been probative to rebut Gagliardi's testimony.

At the end of the day, this is a close enough question to preclude summary judgment right now. Taken in the light most favorable to the *Castillos*, a reasonable jury could find, on these facts, that there is enough circumstantial evidence to disbelieve Gagliardi's testimony on ownership. This is an example of a case where the *gaps* in a movant's summary-judgment presentation cast enough doubt on an asserted fact that the non-movant can reasonably point to the absence of evidence as enough to raise a genuine issue. Having said that, a prompt motion from either side might be granted for very limited and targeted discovery on Showtime, even at this late date, to ascertain the truth of the ownership issue. And, in any event, at the pretrial order stage, the parties should consider whether a special interrogatory would be helpful on this issue (the Court has no firm thoughts on this as of yet). Also, depending on how the evidence plays out at trial, the Court might consider a motion for judgment as a matter of law on the issue. *See* Fed. R. Civ. P. 50(a). But, at this point, G&G cannot prevail on its summary judgment motion because it has not established that a reasonable factfinder *must* find that G&G owns the rights to the Alvarez/Trout fight. Conversely, the Castillos also cannot prevail on this issue

right now, because a jury could reasonably believe Gagliardi's testimony that he purchased the rights.[8]

## 2. Liability under 47 U.S.C. § 605

Assuming that G&G owns the rights to the fight, it would still need to establish El Bajio and the Castillos' liability under 47 U.S.C. § 605. Section 605(a)

---

[8]After the close of summary judgment briefing, the Castillos filed a "Motion to Take Judicial Notice," which was in fact a motion for the Court to consider supplemental authority. *See* R. 337; R. 338. That motion drew the Court's attention to an order in another case, *G&G Closed-Circuit Events, LLC v. Medel's Icehouse, et al.*, Case No. 4:15-cv-01042 (S.D. Tex. June 7, 2016). The order granted summary judgment to the defendant on the grounds that G&G had not established its rights to the broadcast. R. 337 Exh. 1 at 6. Attached to the motion was an affidavit by Gagliardi attesting that G&G owned the rights to the April 20 Trout/Alvarez fight. R. 337 Exh. 2. This affidavit was submitted during summary judgment briefing in the *Medel's Icehouse* case.

In response, G&G pointed out that the opinion that the Castillos submitted as supplemental authority was subsequently vacated. R. 339 at 2-3. G&G also asked for leave to file under seal a copy of a check made out to Showtime Networks, Inc., with the memorandum "April 20, 2013." R. 340; R. 341; R. 344. The motion to file a sealed version of the check is granted, but a public version redacting financial-account numbers and the amount of the payment must be filed by June 28, 2018. But none of this makes a difference to the outcomes on summary judgment (so the defense motion to file a reply, R. 344, is denied). First, the (apparently vacated) order in *Medel's Icehouse* is of very limited persuasive value because it is not clear that the evidentiary record in that case is the same as the record here. The *Medel's Icehouse* order did not discuss any testimony by Gagliardi that substantiated the claims in the affidavit, whereas Gagliardi's testimony is part of the record in this case.

Nor does the new evidence submitted by G&G in response to the Castillos' motion change the result. Even if the Court were to consider this late-filed evidence (which was inexplicably not included in G&G's summary judgment filings), there would still be a genuine issue of material fact as to G&G's ownership of the rights. It is true that the check tends to support Gagliardi's story that G&G purchased the rights to the Alvarez/Trout fight from Showtime. But, contrary to G&G's assertions, the check does not "alone refute any argument" that there was no contract between G&G and Showtime for the fight. *See* R. 339 at 5. The check does contain the memorandum "April 20, 2013," but it does not state outright that the payment was for the fight at issue. *See* R. 340. Presumably Gagliardi or another G&G representative would have to testify that the check was indeed payment for the Alvarez/Trout fight rather than for some other event that took place on April 20. And, as discussed already, Gagliardi's story is odd enough that a jury could reasonably doubt his credibility. So, even considering the check, there are enough unresolved questions about the transaction between G&G and Showtime to prevent summary judgment on the issue of G&G's right to broadcast the fight.

prohibits different forms of satellite signal piracy. 47 U.S.C. § 605(a); *see also J&J Sports Prods., Inc. v. Mandell Family Ventures, LLC*, 751 F.3d 346, 353 (5th Cir. 2014). Section 605(a) is densely worded and not divided into subparagraphs, so it is helpful to break the statute down into sentences:

> **[Sentence 1]** [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

> **[Sentence 2]** No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

> **[Sentence 3]** No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

> **[Sentence 4]** No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

The first sentence of Section 605 is not applicable, because it regulates the behavior of communications personnel. *United States v. Norris*, 88 F.3d 462, 465 (7th Cir. 1996). Sentences 2 and 4 also do not apply here, because they target people

who have "intercepted" satellite communications themselves or received "intercepted" communications from others. "Intercept" means to "tak[e] or seiz[e] by the way or before arrival at the destined place." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 915 (6th Cir. 2001) (quoting *Goldman v. United States*, 316 U.S. 129, 134 (1942), *overruled on other grounds*, *Katz v. United States*, 389 U.S. 347 (1967)). In this case, there are no facts suggesting that the Castillos "took" or "seized" programming on its way to its intended destination. All parties seem to agree that La Pena was the intended endpoint of the DirecTV service at issue, and G&G does not argue that improper use of residential programming in a commercial establishment could be considered "interception." Indeed, G&G relies on the Court's analysis in *Joe Hand Promotions, Inc. v. Killeen*, where the Court held that using residential programming for a commercial establishment was not "interception." *Joe Hand Promotions, Inc. v. Killeen*, 14-cv-3996 (N.D. Ill. Dec. 22, 2015), ECF No. 80 at 9-10. Nor does G&G argue that anyone else "intercepted" the programming before the Castillos exhibited it. Sentences 2 and 4 of Section 605 do not apply.

That leaves the third sentence: "No person not being *entitled* thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a) (emphasis added). So, the question for summary judgment is whether a reasonable factfinder *could* find the Castillos were "entitled" to receive the Alvarez/ Trout fight, or, if not,

whether the factfinder would *have* to find that the Castillos were *not* entitled to receive the programming.

Courts have generally held that Section 605(a) imposes strict liability. *See, e.g.*, *J&J Sports Productions, Inc. v. Jorkay, LLC*, 2013 WL 2629461, at *2 (E.D.N.C. June 11, 2013) (collecting cases finding that 47 U.S.C. § 605 imposes strict liability for violations). Because Section 605 imposes strict liability, courts generally grant summary judgment to plaintiffs if there is undisputed evidence that the defendant exhibited satellite programming without authorization, even when the defendants argue that the violation was caused by mistaken installation of residential programming at a commercial establishment. *See, e.g.*, *J&J Sports Productions, Inc. v. Dabrowski*, 2015 WL 9304347, at *3 (N.D. Ill. 2015); *Joe Hand Promotions, Inc. v. Zani*, 2013 WL 5526524, at *2 (N.D. Ill. Oct. 7, 2013); *Joe Hand Promotions, Inc. v. Ol' River Hideaway, LLC*, 2016 WL 590251, at *3 (W.D. Tex. Feb. 11, 2016); *Eliadis*, 253 F.3d at 916-17.

This case is different. The Castillos have offered evidence that their alleged violation of the statute was actually *caused* by the purported rights-holder's agent. The Castillos testified that Jaime only turned on the fight because Aaron Lockner— who at the time was investigating potential violations on G&G's behalf—asked them to turn it on. Castillo SOF ¶ 42. According to Jaime, Lockner even directed Jaime to the channel where the fight could be found. *Id*. Assuming that this version of events is true (which the Court must do in deciding G&G's summary judgment motion), and assuming that Lockner was acting within the scope of his agency,

there was no violation of Section 605. If the rights-holder (or the rights-holder's agent) asks someone else to turn on their proprietary programming, then the rights holder is effectively giving permission for the program to be shown—which means that the exhibitor would be, in the terminology of Sentence 3, "entitled" to show the program. *Cf. Eliadis*, 253 F.3d at 917 (holding that a party who was contractually authorized to receive and relay a communication was "entitled" to receive and use the communication under Section 605). In this case, the Castillos maintain that Lockner, G&G's agent, asked Jaime Castillo to turn on the program, implicitly granting him permission to do so. This permission means that the Castillos became "entitled" to receive and show the boxing match when Lockner asked them to turn it on. *See* 47 U.S.C. § 605(a), Sentence 3. This result makes sense: it would be bizarre if G&G's agents could effectively cause violations of Section 605 and then collect from their unwitting victims. A reasonable factfinder could decide that this is exactly what happened to the Castillos, so G&G's motion for summary judgment is denied.

That said, the Castillos are not entitled to summary judgment either. The crucial fact dispute about whether or not Lockner asked Jaime to turn on the program could go either way: a reasonable jury could find that Lockner is credible, and that the boxing match was already playing when he arrived.[9] If the match was

---

[9]Both G&G and the Castillos ask the Court to believe their version of events and disbelieve the other side's, but that kind of factual finding is prohibited at the summary judgment stage. It does not matter at this stage that Lockner has been charged with a felony or that he is not a licensed investigator, *see* Castillo SOF ¶¶ 23-24; these facts go only to Lockner's credibility. *See Omnicare,* 629 F.3d at 704 (noting that credibility determinations are the province of the jury). Similarly, the Court cannot decide that Jaime

already playing when Lockner walked in, then the Castillos are liable under Section 605 (so long as G&G owned the commercial distribution rights). In addition to this factual dispute, there are also some fact questions about Lockner's relationship with G&G, and whether he was acting within the scope of his agency when he (allegedly) asked the Castillos to turn on the Alvarez/Trout fight. All of these disputed fact issues prevent the Court from granting summary judgment to the Castillos on the Section 605 claim.

### 3. Individual Liability

If there is liability under Section 605, the Castillos will be individually liable for the violation. Courts generally hold that an individual is liable under Section 605 if she had a right and ability to supervise the violation and had a financial interest in it. *J&J Sports Productions, Inc.*, 2015 WL 9304347, at *4. The Castillos admit that they are co-owners of El Bajio Enterprises, which does business as La Pena, that they were both at the restaurant on the night the fight was shown, and that they both had the right and ability to supervise the goings-on at the restaurant. Castillo Resp. G&G SOF ¶¶ 3, 19. The Castillos had an obvious financial interest in showing the fight, even if they only put it on at Lockner's request: they wanted to make Lockner, a presumed customer, happy. That is enough for individual liability.

---

Castillo's testimony that Lockner asked him to put on the fight is "simply not true," *see* R. 305, G&G Summ. J. Br. at 7. It is for the jury to decide which testimony is credible and which testimony is not, and until that happens, neither side is entitled to judgment.

#### 4. Willfulness

Disputed factual issues also prevent summary judgment on the issue of the Castillos' willfulness. Section 605 provides for enhanced damages up to $100,000 if the violation was "committed willfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). The Castillos moved for summary judgment on this issue, arguing that there are no facts on the record to support a willfulness finding. Castillo Summ. J. Br. at 9. That is incorrect. There are a number of disputed fact issues that go to willfulness. To give a few examples, the parties dispute whether the Castillos turned on the fight on their own initiative, whether the Castillos deliberately obtained residential DirecTV service for their commercial establishment, and whether the Castillos have shown other boxing matches at La Pena. *See* R. 318, G&G Add. SOF ¶¶ 3-4, 7-12; R. 329, Castillo Resp. G&G Add. SOF ¶¶ 2-4, 11; R. 319, G&G Resp. Castillo Mot. Summ J. at 14. With these facts in dispute, the Castillos are not entitled to summary judgment, so the willfulness issue also must go to a jury.

#### 5. Liability under 47 U.S.C. § 553

The Castillos' motion for summary judgment is granted on G&G's claim under 47 U.S.C. § 553. Section 553 applies to unauthorized use of cable, whereas Section 605 deals with satellite television. Even though a plaintiff cannot collect under both Section 605 and Section 553, it is common to plead violations of both statutes when the plaintiff does not know exactly how the alleged piracy occurred (that is, when the plaintiff does not know whether the violation occurred via

satellite or via cable). *J&J Sports Productions, Inc. v. B O B Lounge, LLC*, 2018 WL 300363, at * 4 (E.D. Mich. Jan. 5, 2018). That is exactly what G&G did in this case. *See* R. 1, Compl. Now that it is clear that the alleged violation involved the Castillos' *satellite* TV service, G&G concedes that summary judgment is appropriate on the Section 553 claim. G&G Resp. to Castillo Mot. Summ. J. at 15. So summary judgment is granted against that claim.

## II. Motions to Dismiss

### A. Background

For the purposes of deciding the motions to dismiss, the Court takes as true all the factual allegations in the Castillos' Third Amended Counterclaim. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Castillos allege that G&G and the Law Offices of Thomas Riley "have been engaged in a nationwide scheme … whereby they use questionable means to entrap unsuspecting business and individual consumers who have allegedly violated their licensing rights, and then extort money … using threatening and misleading settlement and litigation tactics." R. 178, Third Am. Counterclaim ¶ 2. According to the Castillos, the scheme works as follows: Riley enlists hundreds of investigators (called "auditors") to search for violations of G&G's television licensing rights. *Id.* ¶ 6. Riley does not interview these investigators or verify their credentials. *Id.* ¶ 7. Riley encourages the investigators to hire their own subcontractors; Riley does not have a direct contractual relationship with these individuals. *Id.* ¶¶ 9-10. The investigators are provided with form affidavits to complete, and encouraged to provide photos and

videos of violations. *Id.* ¶ 13. The investigators use "questionable" tactics to find violations, including asking that a fight be turned on in order to entrap the owners into showing unlicensed programming. *Id.* ¶ 15. According to the Castillos, the investigators frequently lie or exaggerate in their affidavits. *Id.* ¶ 16. Riley does not supervise the investigators, and does not review the affidavits, photos, and videos to make sure they are accurate. *Id.* ¶¶ 11, 17. Investigators are paid only if they find a violation, which gives the investigators an incentive to lie. *Id.* ¶ 69.

G&G and Riley then send "hundreds, if not thousands" of "misleading and threatening form letters" to consumers and businesses, seeking to enter settlements with alleged violators. *See id.* ¶¶ 61-62. G&G and Riley also allegedly make threats and misleading statements over the telephone. *Id.* ¶ 62. The Castillos accuse G&G and Riley of engaging in a number of "unfair" practices in seeking settlements, including implying "guilt" in a civil context, refusing to provide copies of evidence[10] to alleged violators, and refusing to provide the alleged violators with specific statutory references or legal authority for their alleged claims. *Id.* ¶¶ 75-77. G&G and Riley also act unfairly by neglecting to investigate their entitlement to enhanced damages, failing to advise alleged violators to engage attorneys, and failing to advise the alleged violators of statutory provisions that might limit damages. *Id.* ¶¶ 78-80. Riley and G&G demand large sums as settlement "with no statutory basis." *Id.* ¶ 82.

---

[10]Presumably the affidavits, photos, and videos, though the counterclaim does not make this clear. *See* Third Am. Counterclaim ¶ 76.

That is the *general* shape of the scheme; the details emerge in the Castillos' narrative of their own experiences with G&G and Riley. The Castillos allege that Riley contracted with Larry Biela and Associates, a private detective agency in Chicago. *Id.* ¶ 18. Biela subcontracted investigation work to Aaron Lockner. *Id.* ¶ 19. On the night of April 20, 2013, Lockner entered La Pena restaurant and asked Jaime Castillo if he could put "the fight" on. *Id.* ¶¶ 20-23. Jaime did not know what Lockner was talking about, and asked Lockner what channel he wanted. *Id.* ¶ 24. Lockner gave Jaime a channel number, and the fight appeared on the screen without any kind of pay screen or special notice. *Id.* ¶ 25. Jaime was only able to show the fight because DirecTV had set up an improper residential account in La Pena, a commercial establishment. *Id.* ¶ 28.[11]

According to the Castillos, Lockner submitted an affidavit to Riley that contained critical omissions and outright falsehoods.[12] Specifically, Lockner did not disclose in his affidavit that he asked for the fight to be turned on. *Id.* ¶ 29. He also lied about the number of televisions showing the fight, and exaggerated both the

---

[11]The Third Amended Counterclaim alleges that DirecTV *intentionally* installs improper residential satellite TV service in small minority-owned businesses (why DirecTV does this is not explained). *See* Third Am. Counterclaim ¶ 3 & n. 2, ¶ 28. DirecTV was dismissed as a defendant by stipulation in December 2017, and is not a party to the current litigation. *See* R. 292 (12/13/17 Minute Entry).

[12]The Third Amended Counterclaim is unclear about how Lockner prepared the affidavit or how it was used. In fact, it does not even explicitly say that Lockner wrote the affidavit or that he submitted it to Riley. But the Court infers that this happened based on Paragraphs 30 and 31, which state that Biela did not review Lockner's affidavit "prior to submission to Riley," that Riley paid Biela for Lockner's affidavit, and that Biela then paid Lockner.

occupancy of the establishment[13] and the number of patrons in the establishment at the time of his visit. *Id.*

About a month after showing the fight, Jaime received two letters from the Riley law office. The Third Amended Counterclaim characterizes these letters as "threatening and misleading." *See* Third Am. Counterclaim at ¶¶ 32-33. The letters are attached to the counterclaim as exhibits. The first, dated May 29, 2013, stated that Riley was "informed and believe[d]" that the Alvarez/Trout fight was exhibited at Jaime Castillo's commercial establishment without permission, and that any unauthorized broadcast was "in direct violation of the law, including but not limited to Title 47 U.S.C. Section 605, and or Title 47 U.S.C. Section 553." Third Am. Counterclaim Exh. 1. The letter encouraged Jaime to contact Riley in order to reach a settlement to avoid potential liability. *Id.* The second letter, dated July 2, 2013, referenced the first letter and threatened to sue and seek "enhanced statutory damages, compensatory damages, [and] attorneys' fees and costs" unless Jaime "resolve[d] this matter without further delay." *Id.* The letter stated that any opportunity to settle on favorable terms would be withdrawn once litigation commenced. *Id.*

After receiving the second letter, Jaime phoned Riley's office several times. Third Am. Counterclaim ¶¶ 34-35. Eventually, he was given an appointment with an attorney named Julie Dadayan, who worked as an independent contractor for Riley. *Id.* ¶¶ 35 & n.7, 37. At the meeting, Dadayan was "pushy and short." *Id.* ¶ 36.

---

[13]Presumably meaning the restaurant's capacity, as opposed to the number of people actually inside the restaurant at the time of the boxing match.

She told Jaime that she "knew he was guilty," and pushed him to settle. *Id*. Dadayan did not describe any specific legal authority for G&G's claims. *Id*. Dadayan never suggested that Jaime (who had a strong accent) should contact an interpreter, and never suggested that he should consult an attorney. *Id*. ¶¶ 38-39. She did not inquire about whether Jaime had cable or satellite or attempt to elicit facts from Jaime that would have supported (or undermined) a claim of enhanced damages. *Id*. ¶¶ 40-41. Dadayan also did not advise Jaime that his liability might be limited if the violation was unknowing. *Id*. ¶ 44. Dadayan tried to convince Jaime that his only option was to settle, and demanded $20,000. *Id*. ¶ 45. Jaime explained that he did not have that kind of money, and told Dadayan that G&G would have to take him to court. *Id*. ¶ 46.

After the meeting, Jaime received another two letters from Riley, which the Castillos also characterize as "threatening and misleading." *Id*. ¶ 52. The first letter stated that attempts to settle had been unsuccessful, informed Jaime that G&G was preparing to file a complaint against him, and asked Jaime to complete a questionnaire to facilitate service of process. Third Am. Counterclaim Exh. 2. The second letter stated that it was G&G's "*final* overture towards reaching any pre-suit resolution of this matter," and told Jaime that he had until the end of the week to avoid the impending federal lawsuit. *Id*. (emphasis in original). Finally, in March 2014, G&G's Illinois counsel filed a lawsuit against the Castillos. R. 1, Compl. The complaint claimed that the Castillos had violated 47 U.S.C. § 605 or 47 U.S.C. § 553 by exhibiting the Alvarez/Trout fight at La Pena. *Id*.

## B. Motion to Dismiss Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (alteration in original) (cleaned up).[14] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). But claims

---

[14]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

alleging fraud must satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Put differently, the complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up).

## C. Analysis

### 1. ICFA

The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.*, "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA defines "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated." 815 ILCS 505/1(f).

This definition heads off any ICFA claim based on the events described in the Third Amended Counterclaim. For G&G and Riley's actions to fall within the purview of ICFA, G&G and Riley would have had to engage in deceptive acts or

unfair practices "in the conduct of" the "advertising, offering for sale, sale, or distribution" of G&G's property, 815 ILCS 505/1(f). The Castillos allege that G&G, Riley, and their agents engaged in all manner of shady practices in their attempts to extract settlements from unlicensed exhibitors of G&G properties. But G&G's efforts to enforce its rights through litigation and threats of litigation is not "the advertising, offering for sale, sale or distribution" of any property or service, which is what ICFA regulates.

The Castillos argue that the "raison d'etre for this litigation" is G&G's distribution of television programming. That is certainly true in a roundabout way, but that kind of attenuated connection is not enough. ICFA does not prohibit *any* deceptive acts or unfair practices that are in some nebulous way connected to trade or commerce. If it did, ICFA's reach would be nearly endless, given the breadth of trade or commerce. What ICFA actually prohibits are unfair acts and deceptive practices "*in the conduct* of any trade or commerce." 805 ILCS 505/2 (emphasis added). Litigation conduct is not on the list of actions that constitute "trade or commerce" under ICFA, and the Castillos have not convincingly argued that any of the actions described in the counterclaim occurred "in the conduct" of any of the activities on the list. *See Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 595-96 (7th Cir. 2017) (declining to hold that discovery of insurance policy limitations in civil litigation was "trade or commerce"); *Falk v. Perez*, 973 F.Supp.2d 850, 868 (N.D. Ill. 2013) (evicting a tenant is not "trade or commerce"); *cf. Cripe v. Leiter*, 703 N.E.2d 100, 197 (Ill. 1998) (holding that claims arising out of the attorney-client

relationship are not within the purview of ICFA because "the attorney-client relationship in this state … is already subject to extensive regulation") (Ill. 1998). The Castillos' claims are not within the reach of ICFA, so their ICFA claim must be dismissed.[15]

G&G and Riley raise a number of other arguments for dismissing the ICFA claim, including the Illinois litigation privilege, failure to adequately allege standing under ICFA, the *Noerr-Pennington* doctrine, and failure to allege unfair conduct. *See generally* R. 294, G&G Mot. Dismiss Br.; R. 301, Riley Mot. Dismiss Br. Most or all of these arguments would require the Court to tread into unsettled areas of Illinois law. It is generally not the role of federal courts to break new ground in state law, *Roppo*, 869 F.3d at 596, and the Court will avoid doing so here. It is enough to say that the Third Amended Counterclaim has not alleged any unfair or deceptive practices in the conduct of trade or commerce; the other arguments are left for Illinois courts to explore in other cases.

---

[15]The Castillos note that the Court has "twice found that the ICFA claim is sufficiently pled." *See* R. 322, Castillo Resp. to G&G Mot. Dismiss at 7. It is true that the previously assigned judge denied G&G's motions to dismiss two previous versions of the ICFA claim. *See* R. 28, Opinion on Motion to Dismiss Counterclaim at 5-7; R. 73, Opinion on Motion to Dismiss First Amended Counterclaim at 3-5. But the Court's prior decisions are not binding here because there is a new operative complaint. *See Massey v. Helman¸* 196 F.3d 727, 735 (7th Cir. 1999). And, in any event, there is a sensible explanation for the difference in outcome between this motion and G&G's prior motions: G&G did not argue in its prior motions to dismiss that the allegations did not describe unfair practices in the conduct of "trade or commerce." *See generally* R. 17, G&G Br. on Mot. Dismiss Counterclaim; R. 51, G&G Br. on Mot. Dismiss First Am. Counterclaim. When a plaintiff decides to amend a complaint, she takes her chances that the opposing party will come up with new and better arguments in favor of dismissal. *See Massey*, 196 F.3d at 735. In this case, G&G did come up with some better arguments, so the result is different this time around.

## 2. RICO

The Castillos also assert that they have a claim under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* RICO forbids "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).[16] A "pattern of racketeering activity" requires at least two acts of racketeering activity, defined as any one of the long list of offenses in 18 U.S.C. § 1961(1). 18 U.S.C. § 1961(5).

The Castillos argue that Riley and G&G, along with their agents, make up an association-in-fact enterprise, which they name "the Extortion Enterprise." Third Am. Counterclaim ¶ 97. The "Extortion Enterprise" was created for the purpose of extorting settlements and obtaining unfair default judgments, as described in the Third Amended Counterclaim. *See id.* ¶¶ 105-108. The predicate racketeering activities, according to the Castillos, are multiple acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The mail fraud statute criminalizes use of the mails in connection with "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341. The wire fraud statute criminalizes use of the wires in support of the same activities. 18 U.S.C. § 1343. Because the alleged RICO predicate acts are mail and wire fraud,

---

[16]18 U.S.C. § 1962(c) is a criminal prohibition, but 18 U.S.C. § 1964(c) allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal court.

the heightened pleading requirements of Rule 9(b) apply. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994).

### a. Predicate Acts

Unfortunately for the Castillos, the RICO claim falls apart on the predicate acts. A scheme to defraud requires a material false statement, misrepresentation or promise, or concealment of a material fact. *United States v. Weimert,* 819 F.3d 351, 355 (7th Cir. 2016); *United States v. Sloan,* 492 F.3d 884, 890 (7th Cir. 2007). But the complaint does not identify any materially false statements, misrepresentations, or concealments made in furtherance of the alleged fraudulent scheme. Although the Castillos characterize the four letters sent by Riley as "misleading," that characterization is simply incorrect. The letters are actually very straightforward and do not contain any false or even misleading statements. *See* Third Am. Counterclaim Exhs. 1-2. The first letter identifies the boxing match at issue and states that Riley and G&G "are informed and believe" that the program was exhibited at Jaime Castillo's establishment. Third Am. Counterclaim Exh. 1. This is true, as even the Castillos admit. *See* Third Am. Counterclaim. ¶ 25. The rest of the letter merely states that unauthorized broadcast of the fight would be unlawful (also true), and encourages Jaime to settle. Third Am. Counterclaim Exh. 1. The second letter has even less in the way of factual assertions, and again urges Jaime to settle. *Id*. Similarly, the last two letters state that G&G and Riley intend

to file a lawsuit unless Jaime agrees to settle. Third Am. Counterclaim Exh. 2. None of this is false or even misleading.[17]

The Castillos also allege that one of Riley's contractors, Julie Dadayan, made various statements and omissions that were unfair or misleading. *See* Third Am. Counterclaim ¶¶ 36-45. But, as with the letters, none of Dadayan's words or actions rise to the level of materially false or misleading statements or omissions. Indeed, many of the Castillos' allegations boil down to complaints that Dadayan did not guard their interests carefully enough—something that she had no obligation to do. The Castillos allege, for example, that Dadayan did not ask Jaime whether he understood English or whether he would like an interpreter; that she did not advise the Castillos to seek counsel; that she did not perform factual investigation that might have partially exculpated the Castillos; and that she did not advise them of statutory provisions that might have been favorable to them. *Id.* ¶¶ 38-44. None of this is actionable. Dadayan had no obligation whatsoever to give the Castillos legal advice or investigate their potential defenses, and her failure to help them is nowhere close to being a false statement or misleading omission that would support a claim of fraud. Similarly, she had no obligation to investigate Jaime's level of English ability or to advise him that he should contact an interpreter. The Castillos

---

[17]It would be another thing if G&G did not have the commercial distribution rights to the boxing program, but the Castillos do not allege that this is the case. The counterclaim dances around the issue of the rights—complaining that "G&G offers no evidence of these alleged 'exclusive nationwide television distribution rights' in its complaint," Third Am. Compl. ¶ 54; noting that "G&G alleges no facts linking its alleged television distribution rights to any oral or written contract with any entity," *id.* ¶ 55; and referring to G&G's rights to boxing matches as "purported contractual rights," *id.* ¶ 2—but it stops short of actually alleging that G&G lied about having the rights to the Alvarez/Trout fight (or any other fights, for that matter).

do not allege that Dadayan took advantage of Jaime's limited English abilities in order to deceive him, so Dadayan's supposed shortcomings in providing language assistance are not fraudulent.

As for the statements that Dadayan allegedly made to the Castillos—that she "knew [Jaime] was guilty" and that he should settle for $20,000, *see id.* ¶¶ 36, 45— these are just legal opinions or negotiation positions, not the kind of false representations that an opposing party would take as fact and rely on to her detriment. *See, e.g.*, *Weimert*, 819 F.3d at 357 (holding that deception about a party's negotiating positions cannot give rise to a wire fraud conviction); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) ("It is well established … that misrepresentations of the law are not actionable as fraud, including under the mail and wire fraud statutes, because statements of the law are considered merely opinions and may not be relied upon absent special circumstances.").

Nor were any of the statements in G&G's complaint false or misleading representations (even assuming that such statements could be the basis of a RICO claim). The complaint filed by G&G is short on factual detail, and contains only conclusory allegations that the Castillos were supervisors and owners of La Pena (which is true), that G&G owns the rights to the Alvarez/Trout match (which the Castillos do not allege is false), and that the Castillos or their agents unlawfully published, divulged, or exhibited the program (which is a reasonable legal position even on the Castillos' version of the facts). Compl. ¶¶ 9-12, 18, 21. G&G's complaint does not even state how the program came to be shown, so there are no misleading

statements about the the Castillos' alleged entrapment. *See id.* ¶ 21. The Castillos point out that the civil cover sheet for the complaint demands $300,000.00. *See* R. 2. But, like Dadayan's settlement demand, this is a litigation position, not the kind of false assertion that could support a claim of fraud.

The Castillos do allege that G&G, Riley, and their associates sent "misleading and threatening" form letters to hundreds of other consumers and businesses each year. Third Am. Counterclaim ¶ 61. They also allege that G&G and Riley use unfair tactics to pressure these alleged violators to settle. *Id.* ¶¶ 75-82. But these are very general allegations, and mail and wire fraud must be pled with specificity under Rule 9(b). The Castillos have not alleged "the who, what, when, where, and how of the fraud" for any of those hundreds of supposed victims, so they have not stated fraud claim based on any of these events. *Pirelli*, 631 F.3d at 441-42 (cleaned up); *see also Jepson*, 34 F.3d at 1328 ("Loose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do.") (cleaned up); *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) ("[W]e have repeatedly held that a plaintiff's conclusory allegations that 'defendants' also defrauded unidentified 'others' are not enough to plead the requisite pattern of fraud.").

The only materially false or misleading statements described with specificity in the Counterclaim are the lies and omissions in Lockner's affidavit. But the Counterclaim does not describe *how* these false statements are connected to the alleged scheme to defraud. The Counterclaim only implies that Lockner prepared an

28

affidavit, which was submitted to Riley. But the letters sent by Riley to Jaime Castillo do not refer to the allegedly false statements in the affidavit. Nor does the complaint eventually filed by G&G repeat any of the false claims made by Lockner. In fact, there are *no* allegations that Lockner's false statements were used in any way to pressure the Castillos to settle. The counterclaim does not give any explanation of how Lockner's affidavit was used by G&G and Riley (if it was used at all). So, although Lockner allegedly made false statements to Riley, there are no allegations that anyone used Lockner's affidavit to make any false statements or representations in an attempt to defraud the Castillos.

Because the Castillos have not alleged any false or misleading representations or omissions made in connection with the alleged scheme to defraud, they have not alleged any RICO predicate acts of mail or wire fraud.[18] The RICO claim must be dismissed.

### b. RICO Enterprise

Although it is unnecessary to addressG&G and Riley's other arguments in light of the fact that the Castillos have failed to allege predicate acts of racketeering

---

[18]Although the Castillos label the alleged RICO enterprise the "extortion enterprise," and frequently accuse G&G and Riley of engaging in extortion, they do not even attempt to explain how the events in the complaint constitute Hobbs Act or state law extortion. The closest they come is a heading in their response brief that states that "Fraud and Extortion are Sufficiently Pled." *Id.* at 14; Castillo Resp. to Riley Mot. Dismiss at 14. They offer no relevant argument or authority in support of that proposition. It is also worth noting that the counterclaim itself identifies only mail and wire fraud as predicate acts and does not characterize extortion as a predicate act. *See* Third Am. Counterclaim ¶¶ 101, 116. If Castillos intended to argue that G&G and Riley engaged in predicate acts of extortion, they needed to develop that argument in their briefs. The Court will not construct the argument for them. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Nor do the Castillos argue that any of the actions described in their counterclaim constitute bribery.

activity, one argument made by G&G and Riley merits a quick discussion. G&G and Riley assert that the Castillos failed to allege a RICO enterprise because the enterprise they describe has no purpose other than committing RICO predicate acts. G&G and Riley suggest that the Court should ignore all allegations of predicate acts when determining whether a RICO enterprise exists, and look only at what allegations remain when the predicate acts are taken out. G&G Mot. Dismiss Br. at 18; Riley Mot. Diss. Br. at 11-12. That is not the correct test. A RICO enterprise needs only three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). There is no requirement that the Court "zero out" the alleged RICO predicate acts when deciding whether these three structural features have been alleged. In other words, *Boyle* does not hold that an enterprise must have a *lawful* purpose separate from the purpose of committing crimes. To the extent that some case law appears to hold otherwise, that law is not consistent with *Boyle*.

In this case, the Castillos have done enough to allege a RICO association-in-fact enterprise. The association made up of G&G, Riley, and their agents has a purpose (extorting settlements), relationships among the associates (agency and independent contractor relationships), and longevity (the association lasted at least long enough to attempt to run the scheme on the Castillos). That is all that is required.

### c. RICO Conspiracy

18 U.S.C. § 1962(d) prohibits conspiracy to violate Section 1962(c). Because the Castillos have not stated a valid claim of violation of Section 1962(c), their Section 1962(d) conspiracy claim fails as well. *See, e.g.*, *United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856-57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), the [plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts."). The RICO conspiracy claim is dismissed.

### 3. Riley's Arguments

The Castillos' counterclaims against Riley are dismissed for the reasons stated above. For the sake of completeness, however, it is worth discussing a couple of Riley's arguments. First, Riley argues that it was not timely named as a counter-defendant. Riley points out that back in December 2015, the magistrate judge assigned to the case set March 1, 2016 as the deadline to name additional parties.[19] R. 75 (12/02/15 Minute Entry). Riley was not added as a party until after this deadline. Riley's argument (as best as the Court can make out) seems to be that the only proper way to amend the complaint to add Riley as a counter-defendant would have been to appeal from the magistrate judge's December 2015 order setting the deadline to add defendants. *See* Riley Br. at 3-5. But this argument does not work. Riley's argument implies that the *only* way to change a magistrate judge's

---

[19]The Minute Entry actually says "3/1/15," but this must have been a typo, because the order was issued in December 2015.

scheduling order is to appeal the order under Federal Rule of Civil Procedure 72, which requires a party to object to a magistrate judge's nondispositive orders within 14 days. Fed. R. Civ. P. 72(a). Under Riley's rule, any party who sought to change a deadline for good cause more than two weeks after the entry of a magistrate judge's order would be forever out of luck—a plainly absurd result. What's more, Rule 16 explicitly allows courts to amend their own scheduling orders for good cause. *See* Fed. R. Civ. P. 16(b)(4); *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). That is what happened in this case. In April 2016 (after the magistrate judge's deadline to add additional defendants), the Castillos asked to amend their Second Amended Counterclaim in order to add additional defendants based on information learned in recent depositions. R. 165, Motion to Amend/Correct Briefing Schedule ¶ 6; R. 169 (4/27/16 Minute Entry). After an oral hearing, the previously assigned District Judge granted leave to amend to add Riley as a counter-defendant. R. 169 (4/27/16 Minute Entry). The addition of Riley as a counter-defendant was proper; the Castillos did all they were required to do.

Riley's second argument is that naming the Law Offices of Thomas P. Riley as a counter-defendant deprives G&G of its counsel of choice. Riley Br. at 7-8. This argument is even more puzzling than Riley's Rule 72 argument. Riley never represented G&G in this case, and Riley does not explain how its status as G&G's co-defendant in this case would prevent it from representing G&G in any other case. Nor has Riley cited any authority to explain why such a conflict (if any existed)

would be grounds for dismissing potentially meritorious claims against Riley. In short, neither of Riley's additional arguments holds water.

### III. Conclusion

For the reasons stated above, summary judgment is granted to the Castillos on the Section 553 claim, but the summary judgment motions are otherwise denied. The motions to dismiss are granted in full. The dismissal is with prejudice. The Castillos have already had three opportunities to amend their counterclaim, and more chances will not be given in light of those three chances and the fact that this case is over four years old. The Law Offices of Thomas P. Riley is thus out of the case now (at least as a party; it is possible that Thomas Riley and his associates could be called as witnesses at trial). In order to give G&G and the Castillos enough time to review this Opinion and reconsider settlement positions, the status hearing of June 21, 2018 is reset to July 9, 2018 at 10:15 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 20, 2018