# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-CV-02073 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JAIME F. CASTILLO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

G&G Closed Circuit Events, LLC, a distributor of pay-per-view events, sued Jaime Castillo, Maria Castillo, and their company, El Bajio Enterprises (for convenience's sake, collectively referred to as the Castillos), for illegally broadcasting a boxing match in violation of 47 U.S.C. § 605.[1] The case went to trial, where the jury found in favor of G&G, but also found that the Castillos were not aware, and had no reason to know, that they were violating Section 605 when they broadcast the fight. The Castillos now move for judgment as a matter of law or, in the alternative, a new trial. Both parties have also submitted briefing on damages, which is determined by the court in these types of cases. For the reasons discussed below, the Castillos' motions are denied, and the Court awards G&G $800 in statutory damages.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and page or paragraph number.

# I. Background

In setting forth the facts in this post-trial setting, the evidence is interpreted in G&G's favor on liability, because G&G prevailed on that issue. On willfulness and commercial advantage, however, the Castillos won, so the evidence on those issues is read in their favor.

## A. G&G

G&G was a commercial distributor of pay-per-view events, including special sporting events, concerts, and boxing matches. Trial Tr. at 159:19-22. Founded in 2009, it worked with networks like Showtime and HBO to advertise, sell, and distribute pay-per-view events to commercial accounts like bars, restaurants, and nightclubs. *Id.* at 160:1-14. G&G had "exclusive rights" to the events it distributed, meaning any commercial establishment that wanted to play the event needed to go through G&G and pay them a licensing fee. *Id.* at 160:15-24. The fee varied based on the capacity of the commercial establishment. *Id.* at 162:12-21. G&G in turn either split that fee with the network or paid the network an up-front fee for the right to distribute the program. *Id.* at 160:23-161:4. All that was for distribution at *commercial* establishments; G&G has never acquired or sold rights for *residential* distribution. *Id.* at 169:1-8.

G&G alleges that it owned the commercial-distribution rights to a boxing match between Austin Trout and Saul Alvarez televised on April 20, 2013 (call it the Program, for convenience's sake). Trial Tr. at 555:13-17. G&G's president, Nicholas Gagliardi, testified that G&G had a "split deal" with Showtime for the Program—

2

G&G kept 30% of money generated from selling the Program to commercial accounts, and would send the remaining 70% back to Showtime. *Id.* at 161:17-24. Gagliardi explained that G&G's deals with Showtime were often set up in this way and were historically arranged by Gagliardi's brother, who "had been working with Showtime for several years in doing distribution." *Id.* at 161:17-21. Gagliardi also testified about a "rate card" that G&G gave to its sales representatives for the Program. The card showed that an establishment with a capacity of 0-100 people would need to pay $800 to play the Program. *Id.* at 164:8-165:14, 166:21-167:3. Included in this fee was the cost to activate an account through either DirecTV or DishNetwork, because access to those providers was required to show the Program. *Id.* at 167:7-13.

Gagliardi also testified that, in lieu of a formal written contract, G&G's deals with Showtime were typically discussed via email and phone. Trial Tr. at 170:19-171:3. Despite the history of email communications, Gagliardi was unable to find emails with Showtime negotiating the rights to the Program because his computer had been corrupted, and he was not able to restore it. *Id.* at 171:4-10. But G&G was able to present, at trial, the check it sent to Showtime after the Program was broadcast, representing 70% of the total distribution sales, or $220,331. *Id.* at 172:7-173:17. The check referenced the date of the Program on the memo line, and Gagliardi testified that G&G sent the check to Showtime and that the company cashed it. *Id.* at 173:18-174:4.

On top of its agreement with Showtime, G&G had a separate written agreement with DirecTV, the satellite provider for the Program. Trial Tr. at 174:23-

3

175:18. Gagliardi explained that the agreement required any commercial account ordering the fight through DirecTV to purchase it through G&G. *Id.* at 178:22-179:4. G&G presented the agreement—entitled Program Exhibition Agreement—at trial, although the copy shown to the jury was signed only by Gagliardi on behalf of G&G. *Id.* at 177:2-5, 181:14-24. Gagliardi explained that DirecTV would prepare and send the agreements to him, and that the copy of the Program agreement he was able to track down was the version he signed and returned to DirecTV, rather than the fully executed version. *Id.* at 181:20-24, 183:2-9. Gagliardi clarified, though, that the two parties had an executed agreement pursuant to which he paid DirecTV money to broadcast the program. *Id.* at 182:3-9.

G&G also presented a document referred to as the domestic distribution rights agreement. Trial Tr. at 182:10-12. Gagliardi explained that he likely provided this document to G&G's attorney and sales representatives because it explained that Showtime had granted G&G "exclusive domestic closed-circuit distribution and licensing rights" to the Program. *Id.* at 182:13-18, 183:19-184:17. Gagliardi testified that G&G had commercial licensing agreements for the Program with Buffalo Wild Wings, Hooters, Dave & Buster's, and several other national chain restaurants, along with other smaller businesses. *Id.* at 192:18-22.

Gagliardi also discussed the ways commercial customers are able to "steal" a program, meaning broadcast the program without paying for it. He explained that technology and streaming had made it much easier for businesses to broadcast pay-per-view programs without paying the requisite fee, and that this "has a great impact

on [his] business." Trial Tr. at 186:12-20. According to Gagliardi, every time a commercial location pirates a broadcast, it has a ripple effect beyond that one establishment—it discourages other establishments from purchasing because they feel that it is not worth it if other nearby businesses are showing the same program for free. *Id.* at 187:2-8. As a result, G&G hires investigators to locate businesses that illegally broadcast their programs. *Id.* at 191:4-15.

### B. La Peña

La Peña was a Chicago restaurant owned and operated by Jaime and Maria Castillo. Trial Tr. at 345:23-346:1; 347:16-24. The Castillos opened the restaurant in 2001 after they bought the building in which La Peña is located. *Id.* at 346:2-12. In addition to the restaurant on the first floor, the building has four apartments upstairs, including the apartment where the Castillos live. *Id.* at 346:15-24. In 2013, the Castillos had accounts with multiple cable providers. They had accounts for their apartment with Comcast and Dish Network, as well as an account with DirecTV for the restaurant. *Id.* at 350:24-351:23. Jaime testified that he was the one to set up all of the accounts, including the DirecTV account for La Peña, which he opened in November 2011. *Id.* at 351:9-352:3. Jaime testified that he believed (in his own mind) that the DirecTV account was set up in La Peña's name as a *business* account, but it is undisputed that it was actually set up as a *residential* account in Jaime's name. *Id.* at 352:20-355:25.

For the entertainment of La Peña's customers, the Castillos play different types of music and also show sports and other programming on a number of

televisions in the restaurant. Trial Tr. at 380:8-381:18. It is undisputed that on April 20, 2013, some La Peña employee played the Program on the televisions around the bar in the restaurant. *Id.* at 384:2-10. Jaime testified that this happened only because a customer came into La Peña and asked to watch the Program. *Id.* At trial, Jaime could not remember what the customer looked like. *Id.* at 386:15-24. But at her deposition, Maria testified that Jaime told her that the customer who asked to watch the Program looked "Hispanic." *Id.* at 487:22-489:12. In any event, as far as Gagliardi knows, G&G never authorized La Peña to show the Program. *Id.* at 185:20-22.

On the night of the Program, a private investigator working for G&G's attorney—Aaron Lockner—was driving around Chicago looking for businesses that were illegally broadcasting the Program. Trial Tr. at 261:19-262:12. Lockner received a list of businesses that paid for the Program ahead of time, so he was "basically hunt[ing] around and search[ing] around for places that were not on that list." *Id.* at 262:15-18. Lockner was paid for his work based on the number of commercial establishments he found in violation and reported on, meaning he was incentivized to find as many violators as possible. *Id.* at 263:8-19. If he found violators, then his job was not to ask them to turn off the Program, but rather to discreetly take pictures and video of the broadcast as evidence of the violation. *Id.* at 265:15-266:17.

Lockner testified at trial that he noticed La Peña on the night of the Program, because he could see, as he was driving by, a boxing match on the televisions inside. Trial Tr. at 269:11-15. He then walked inside the restaurant where he saw four wall-mounted televisions playing the Program. *Id.* at 278:14-19, 280:19-281:18. Lockner

was able to catch some of the Program on his camcorder from inside the restaurant; the video was played at trial. *Id.* at 289:5-290:15. He also read from the affidavit that he wrote and executed; the affidavit's content was based on the notes he took that night. *Id.* at 278:14-19, 300:13-22. In the affidavit, Lockner explained that he watched Rounds 4 and 5 of the fight; he estimated that the capacity of the restaurant was 120 people; and that he counted between 60 and 65 patrons in the restaurant. *Id.* at 282:18-283:12. After recording the video inside La Peña, Lockner walked out and took additional video of the outside of the restaurant (that video too was played at trial). *Id.* at 294:22-295:6; 298:5-15. In the video, it is possible to see a boxing match playing on the TVs through the front window. *Id.* at 295:7-296:7.

At trial, Lockner testified that he did not ask anyone in La Peña to turn on the Program because it was not "honest." Trial Tr. at 296:13-24. Lockner also stated that he does not speak Spanish, he is not of Spanish descent, and that he had long hair, past his shoulders, in 2013. *Id.* at 279:20-23, 296:25-297:10. According to his affidavit, Lockner was in La Peña for 10 minutes and then took the film outside on the sidewalk for just another minute or two. *Id.* at 299:8-17, 300:10-12. He also testified that he did not speak to anyone inside of La Peña, either customer or staff. *Id.* at 311:8-23.

## C. Procedural History

Lockner's affidavit eventually made its way to G&G's attorney, Thomas Riley, prompting Riley to send a letter to the Castillos outlining their alleged violations and requesting a settlement. R. 178.1, Riley Ltrs. at 2. Riley sent three more letters offering to settle with the Castillos, but they refused. *Id.* at 3-6. Finally, in March

2014, G&G filed suit against the Castillos and their holding corporation, El Bajio Enterprises, alleging violations of the Communications Act of 1934 (as amended), 47 U.S.C. § 605, and the Cable and Television Consumer Protection and Competition Act of 1992, 47 U.S.C. § 553. R. 1, Compl. ¶ 1. The Castillos eventually filed counterclaims against G&G, as well as DirecTV and Riley, alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the federal Racketeer Influenced and Corrupt Organizations Act. R. 178, Third. Am. Counterclaim.

In June 2018, the Court granted summary judgment to the Castillos on G&G's Section 553 claim but dismissed all of the Castillos' counterclaims. R. 350, 6/20/18 Memo. Opinion and Order. The parties began trial on G&G's remaining Section 605 claim in January 2019. After hearing four days of testimony and evidence, the jury returned a liability verdict in favor of G&G, finding that G&G had the exclusive commercial distribution rights to the Program and that the Castillos were not entitled to show it in La Peña. R. 403, 1/10/19 Minute Entry. The jury also found that (1) the Castillos did not act willfully or for the purposes of direct or indirect commercial advantage or private financial gain; and (2) the Castillos were not aware and had no reason to believe that their acts violated the law. *Id.*

## II. Standard of Review and Standard on Damages

Under Rule 50(a) of the Federal Rules of Civil Procedure, a district court may enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier–Bartels v. Chi.*

8

*Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id.* And the Court "can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) (cleaned up).[2] Put another way, "discrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive" will not render testimony excludable. *Whitehead v. Bond*, 680 F.3d 919, 926 (7th Cir. 2012) (cleaned up).

A court may grant a motion for a new trial under Rule 59 if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. Fed. R. Civ. P. 59. "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633 (cleaned up). The district court, however, may not simply substitute its judgment for the jury's. "Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Whitehead*, 680 F.3d at 928. The standard for granting a new trial is, thus, relatively high and a motion requesting as much will only be granted "when the record shows that the jury's verdict resulted in a miscarriage of justice or

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citaions have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* at 927-28.

Finally, under Section 605(e)(3)(C)(i), an aggrieved party is entitled to either actual damages suffered as a result of the violation and any profits of the violator that are attributable to the violation, or statutory damages for each violation in a sum not less than $1,000 or more than $10,000. 47 U.S.C. 605(e)(3)(C)(i). If statutory damages are awarded, then district courts have discretion to decide the amount. 47 U.S.C. 605(e)(3)(C)(i)(II). In addition, Section 605(e)(3)(C)(iii) allows courts to reduce damages awards where "the violator was not aware and had no reason to believe that his acts constituted a violation of this section." 47 U.S.C. § 605(e)(3)(C)(iii).

## III. Analysis

### A. Defendants' Rule 50(b) Motion

The Castillos now move for judgment as a matter of law on the question of whether G&G had the exclusive commercial rights to the Alvarez-Trout fight. R. 417, Defs.' Post-Trial Mots. at 2-9.[3] As an initial matter, G&G argues that the Castillos forfeited some of the arguments in their Rule 50(b) motion, because they failed to make them in their pre-verdict Rule 50(a) motion. R. 419, Pl.'s Opp. at 5-6. G&G is

---

[3]Technically speaking, the Castillos also have a Rule 50(a) motion pending before the Court. R. 398, Def.s' Rule 50(a) Mot. Typically, the issues addressed in a party's post-verdict motion mirror those addressed in its pre-verdict motion, because a post-verdict Rule 50(b) motion "can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50, Advisory Comm. Notes 2006 Am. The Castillos have abandoned one of their pre-verdict arguments—that G&G failed to show the Castillos acted willfully—in their post-verdict briefing, presumably because the jury ruled in their favor on that issue. Because the only argument unique to the Rule 50(a) motion is moot, the Court will refer solely to the Rule 50(b) motion in this opinion, although the decision resolves both motions.

correct that a post-verdict Rule 50(b) motion "can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50, Advisory Comm. Notes 2006 Am. In other words, "if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object." *Andy Mohr Truck Center, Inc. v. Volvo Trucks N. America,* 869 F.3d 598, 605 (7th Cir, 2017).

Recently, though, the Seventh Circuit has drawn a distinction between "grounds" for relief—which must be first articulated in a Rule 50(a) motion—and "arguments in support" of those grounds—which can differ between the pre-verdict and post-verdict motions. *Andy Mohr Truck Center, Inc.,* 869 F.3d at 604-05 ("The district court, however, understood Volvo as merely advancing a new argument in support of a ground that appeared in its original 50(a) motion: that the evidence was insufficient."). Applying that distinction here, some of the Castillos' "new" arguments in their Rule 50(b) motion are not procedurally barred, because they amount to the same thing as was argued in the pre-verdict motion—G&G presented insufficient evidence that it had the exclusive commercial rights to the Program. This applies to the Castillos' arguments that there was insufficient evidence of an agreement with Showtime and that the evidence presented on this topic was conflicting and inconsistent. Defs.' Post-Trial Mots. at 6-9.

But the other arguments advanced post-verdict—(1) G&G failed to establish that they were an aggrieved party with proprietary rights (as opposed to establishing an agreement with Showtime); (2) the jury needed specific instructions defining the

11

terms "aggrieved party" and "proprietary rights;" and (3) the Court should have looked to copyright law for those definitions—are all procedurally barred. *Id.* at 3-6. These arguments fall outside of ground advanced in the Castillos' Rule 50(a) argument, that is, G&G presented "no evidence that Showtime acted in any way to express a mutual and common purpose with G&G with a view of altering its rights and obligations." Defs.' Rule 50(a) Mot. at 3. So these three arguments are forfeited.

On the preserved argument, the Castillos' contention fails on the merits. Although it is a close call, the jury here had a "legally sufficient evidentiary basis" to find in favor of G&G on the question of whether G&G had exclusive rights to distribute the Program. *Whitehead*, 680 F.3d at 925. The jury was free to credit Gagliardi's testimony that G&G had an agreement with Showtime that was specific to the Program, even considering some of the modestly conflicting statements about the relationship between the two entities. *Id.* ("[T]he court does not make credibility determinations or weigh the evidence.") (cleaned up). It was also free to consider additional evidence presented corroborating Gagliardi's story—the G&G check made out to Showtime, G&G's agreement with DirecTV, and G&G's rate card for the Program. In particular, it would be odd for DirecTV, a sophisticated business, to enter into the agreement with G&G unless G&G had exclusive commercial distribution rights. Taken together, this evidence is enough for a reasonable juror to find that G&G had the exclusive commercial distribution rights to broadcast the Program. The Castillos' motion for judgment as a matter of law is denied.

12

### B. Defendants' Rule 59 Motion

The Castillos also move for a new trial under Rule 59, advancing several arguments.[4] Defs.' Post-Trial Mots. at 9-15. The Court addresses them in turn.

### 1. "Aggrieved party" and "proprietary rights"

First, the Castillos argue that the Court erred when it failed to include and define the terms "aggrieved party" and "proprietary rights" in its statement of the case, jury instructions, or verdict form. Defs.' Post-Trial Mots. at 10. This argument fails. To begin, the Castillos never argued before or during trial that the case statement (as distinct from the jury instructions) should include either the term "aggrieved party" or "proprietary rights." R. 365, Defs.' Proposed PTO at 2; R. 390, Defs.' Mot. to Reconsider at 3. So that argument is procedurally barred. *See Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012); *Prod. Specialties Grp., Inc. v. Minsor Sys., Inc.*, 513 F.3d 695, 699 (7th Cir. 2008) ("A motion for a new trial is not the appropriate place to raise for the first time arguments that could have been brought earlier in the proceedings.").

On the other hand, the Castillos did argue that the jury instructions should define the terms "aggrieved party" and "proprietary rights," while also proposing a verdict form that at least asked the jurors to determine if G&G had "proprietary

---

[4]The Castillos raised two arguments in a footnote: (1) "the Court improperly prevented Plaintiff from effectively cross-examining Plaintiff's only witness by sustaining objections with no basis;" and (2) G&G made statements "without evidentiary support" during their opening statement and closing argument. Defs.' Post-Trial Mots. at 9. Because G&G presented these arguments only in a cursory way and failed to substantively develop them, they are forfeited. *Evergreen Square of Cudahy v. Wisconsin Housing & Econ. Development Authority*, 848 F.3d 822, 829 (7th Cir. 2017).

13

rights"—in those words—to the Program. *See* R. 365.6, Defs.' Proposed Jury Instructions at 6; R. 365.7, Defs.' Proposed Verdict Form at 1. These proposals were rejected, because the jury instructions as given accurately stated the law and did not mislead the jury. *U.S. v. Funds in the Amount of $100,12*, 901 F.3d 758, 767 (7th Cir. 2018) (explaining that a movant must prove jury instructions failed to fairly and accurately summarize the law and misled or confused the jury to warrant a new trial). The jurors were asked to determine if G&G entered into an agreement with Showtime for the exclusive rights to distribute the Program to commercial establishments. That is just a non-legalese way of asking them to determine if G&G was an aggrieved party with proprietary rights to the Program. By taking the question out of legalese, the Court adhered to the Seventh's Circuit guidance that, when "instructing laypersons on the law, the judge should extract from the relevant legal sources the essential rules or principles that the jury is to apply … and should state those rules and principles in simple, everyday, nonlegalistic language." *Native American Arts, Inc. v. Waldron Corp.*, 399 F.3d 871, 875 (7th Cir. 2005).

Even if it was error to remove the exact terms "aggrieved party" and "proprietary rights," though, there is nothing to suggest that the instructions as given misled or confused the jury. To determine whether the instructions were "potentially confusing or misleading," the Court "examin[es] the instructions as a whole" to see "if the correct message was conveyed to the jury reasonably well." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009) (cleaned up). The jury was instructed that G&G needed to prove it had "the exclusive commercial distribution

14

right" to the Program, meaning it had to show that Showtime agreed to make G&G the lone distributor of the Program to commercial establishments. There is no risk that the jurors were misled into thinking that all G&G had to show was *any* type of contract with Showtime, or some generalized, nebulous agreement between the parties. Rather, the instructions clearly and accurately stated G&G's burden of proof.

Likewise, the Court did not err when it decided against including the term "proprietary rights" on the verdict form. The Seventh Circuit requires only that the verdict form not be confusing or misleading to the jury. *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012). "In evaluating whether a verdict form is confusing or misleading, we consider the verdict form in light of the instructions given to determine whether the jury had an understanding of the issues and its duty to determine those issues." *Id.* (cleaned up). The jury had that understanding here. It was asked to determine if G&G had the exclusive commercial distribution rights to the Program. R. 386, Verdict Form at 1. This is just another way of asking if G&G had proprietary rights to the fight, with the added benefit of aligning the verdict form with the instructions and the elements of the claim. So, a new trial is not warranted based on the decision not to use the terms "proprietary rights" or "aggrieved party."

## 2. Affirmative Defenses

Second, the Castillos make a series of arguments related to their alleged affirmative defenses. The first argument is that the verdict form failed to account for the possibility that Lockner asked Jaime to turn on the Program. Defs.' Post-Trial Mots. at 11. As already stated, the verdict form is evaluated along with the jury

15

instructions to determine if the jury properly understood its responsibilities. The jury instructions here clearly articulated the Castillos' affirmative defense and its potential effect on the verdict: "If Plaintiff's investigator asked the Defendants to turn on the Program, then the Defendants were entitled to show the Program." R. 400, Jury Instructions at 18. In other words, the instructions informed the jury that in evaluating whether the Defendants were liable, they were to consider whether Lockner asked a La Peña employee to turn on the fight. Contrary to the Castillos' assertion that the absence of the affirmative defense from the verdict form calls the entire verdict into question, Defs.' Post-Trial Mot. at 11, the jury's finding in favor of G&G on liability means that the jury rejected this affirmative defense.

The Castillos make several additional arguments related to the jury instructions and verdict form, but they are all meritless. The Castillos argue that the jury was confused when the Court asked it if G&G proved that the Castillos were not entitled to show the program. Defs.' Post-Trial Mot. at 11. Contrary to the Castillos' motion, there is nothing inherently wrong with asking the jury if plaintiff proved a negative. *Id.* But, more importantly, the question was not confusing or misleading. The pertinent question was whether the Castillos were entitled to show the program or not. For G&G to win, it had to prove that the Castillos were not entitled to do so by a preponderance of the evidence. The instruction clearly asks the jury whether G&G proved that element. Nothing more is required of the verdict form.

The Castillos also assert that the verdict form failed to account for their argument that they mistakenly believed they had a residential DirecTV account in

16

La Peña. Defs.' Post-Trial Mot. at 11-12. But the Castillos' subjective belief about the type of account used in La Peña has no bearing on the jury's *liability* finding (as distinct from damages), because Section 605 is a strict liability statute. *See, e.g., J&J Sports Productions, Inc. v. Dabrowski*, 2015 WL 9304347, at *3 (N.D. Ill. 2015); *Joe Hand Promotions, Inc. v. Zani*, 2013 WL 5526524, at *2 (N.D. Ill. Oct. 7, 2013). Indeed, this subjective mistaken belief was relevant to the jury's special finding that the Castillos "were not aware and had no reason to believe" they were violating Section 605. Because the jury found in favor of the Castillos on that issue, it is clear that the jury was not confused by the absence of an explicit mention of DirecTV or "residential account" on the verdict form.[5]

The Castillos make the similar argument that neither the jury instructions nor the verdict form considered the possibility that a customer—other than Lockner— may have asked Jaime to turn on the Program. Defs.' Post-Trial Mot. at 12. This argument is a nonstarter. As explained in the opinions and orders issued before the trial, the Castillos escape liability only if *Lockner* asked them to turn on the Program, because he was acting as G&G's agent. R. 350, Summary Judgment Order; R. 377, PTC Order at 3. If a random customer asked to turn the fight on, then strict liability still applies. This alleged "affirmative defense" is no defense at all, and thus had no place in the jury instructions or verdict form.

---

[5]The Castillos mention that this affirmative defense is relevant to the damages calculation. Defs.' Post-Trial Mots. at 12. The Castillos are not wrong, but that does not mean the Court was required to turn this defense into a special finding on the verdict form. Indeed, because damages are determined by the *Court*, not the jury, there is no reason why the jurors needed to address this argument in a special finding.

### 3. Motions in Limine

The Castillos next argue that the Court abused its discretion when it granted some of G&G's motions in limine and denied some brought by the Castillos. Defs.' Post-Trial Mots. at 13-14. The Castillos fail to reference specific motions in limine by number or cite to the Court's pre-trial conference orders in support of this argument. R. 377, PTC Order; R. 380, Post-PTC Order. As far as one can tell, the Castillos take issue with the decision to admit some evidence of their billing records from other vendors, while excluding evidence of (1) G&G's alleged racial profiling; (2) Defendants' dismissed counterclaims against G&G, Riley, and DirecTV; and (3) other lawsuits brought against G&G by other commercial establishments. Defs.' Post-Trial Mots. at 13-14. The bases for these decisions are laid out in the orders issued before the trial, but a brief summary is repeated here.

First, evidence of G&G's alleged racial profiling was excluded because it was not a valid defense to Section 605 liability and the Castillos failed to proffer evidence sufficient to push the theory beyond speculation. PTC Order at 1-2. Second, exhibits related to the Castillos' counterclaims and suits brought against G&G by other establishments were excluded as either inadmissible propensity evidence (the letters from Riley, the twelve investigator affidavits, and the other lawsuits) or inadmissible hearsay (the affidavit from Gabriela Padilla Rivera).[6] *Id.* at 3-6. Finally, G&G's proffered evidence about La Peña's other vendors was allowed because there was

_____

[6]Some evidence related to the Castillos' suit against DirecTV was allowed at trial. Pre-Pretrial Conference Order at 5-6. The Court excluded the only evidence related to the Castillos' assertion that DirecTV installed residential accounts in other commercial establishments—the Rivera affidavit—as inadmissible hearsay. *Id.* at 6.

some relevance to the invoices sent to the Castillos in light of the need for a special finding on willfulness. *Id.* at 8-9. The invoices made it more likely that the Castillos could discern between residential and commercial accounts. *Id.* It also is not clear why the Castillos now seek to rehash this evidence. They convinced the jury that they did not act willfully and were not aware they were violating Section 605. So excluding this evidence would not have impacted the verdict—they won on this issue. In any event, none of the decisions on the motions in limine led to an unfair trial, so there is no need to retry the case.

### 4. Evidence of Agreement with Showtime

The Castillos' final argument in support of their motion for a new trial is that the jury's finding that G&G had the exclusive commercial distribution rights to the Program was against the manifest weight of the evidence. Defs.' Post-Trial Mots. at 15. This argument is underdeveloped in the brief and, in any event, is meritless. As explained earlier, there was sufficient evidence of an agreement between G&G and Showtime, and the jury credited it against the defense cross-examinations and arguments. The evidence—although not overwhelming—was not against the manifest weight of the evidence. It is true that Gagliardi's direct testimony standing alone would have been a thin reed on which to rely. But the circumstantial evidence buttressed the direct testimony. It is not likely that G&G would have put the effort into marketing the Program and creating a rate card for its sales representatives without exclusive commercial distribution rights. Nor would it cut a check for over $200,000 to Showtime for no good reason. And the fact that DirecTV—a disinterested

19

non-party and a sophisticated one at that—was willing to enter into an agreement with G&G premised on the distribution rights is telling too. The jury finding for G&G on liability was not against the manifest weight of the evidence.

### C. Damages

With liability intact, the Court's final duty in this case is to decide the amount of statutory damages to award G&G. The parties disagree on the proper baseline measure for the damages calculation. The Castillos argue that damages should be calculated based on the licensing fee of $800. Defs.' Post-Trial Mots. at 1. G&G argues that damages should be calculated based on the number of patrons in La Peña the night of the Program. R. 416, Pl.'s Damages Mot. at 6. The Castillos have the better argument. "[C]ourts in this district have utilized the baseline method when that information is available from a rate card." *J&J Sports Prods., Inc. v. Dabrowski*, 2015 WL 9304347, at *6 (N.D. Ill. Dec. 22, 2015) (listing cases). That is true even when the per-patron valuation is also attainable. *Id.*

G&G argues that the rate card approach is not applicable here, because awarding the licensing fee does not fully divest the Castillos of any profits they may have derived from unlawfully showing the Program. And, because enhanced damages are not in play, there is no other way to do so. Pl.'s Damages Mot. at 5. But G&G overlooks the impact of the jury's finding under Section 605(e)(3)(C)(iii). The jury determined that the Castillos were not aware, and had no reason to believe, that they were violating Section 605 when the turned on the Program, so it is not appropriate to divest them of all their potential profits. Here, on balance and absent misconduct

that amounted to willfulness, the proper award is what it would have cost the Castillos to lawfully show the Program. The Court thus awards $800 to G&G under Section 605(e)(3)(C)(i)(II). Because the Court already factored in the jury's special finding under Section 605(e)(3)(C)(iii), the damages will not be reduced any further.

### III. Conclusion

The Court denies the Castillos' motions for judgment as a matter of law and a new trial. The Court awards G&G $800 in statutory damages under 47 U.S.C. § 605(e)(3)(C)(iii). Final judgment shall be entered. The status hearing of September 26, 2019 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 5, 2019