UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:14-CV-02073 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JAIME F. CASTILLO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

G&G Closed Circuit Events, a distributor of pay-per-view events, sued Jaime Castillo, Maria Castillo, and their company, El Bajio Enterprises (for convenience's sake, collectively referred to as the Castillos), for illegally broadcasting a boxing match in violation of 47 U.S.C. § 605.[1] The case went to trial, where the jury found in favor of G&G, but also found that the Castillos were not aware, and had no reason to know, that they were violating Section 605 when they broadcast the fight. This Court denied the Castillos' motion for judgment as a matter of law or, in the alternative, for a new trial, and awarded G&G $800 in statutory damages. G&G now moves for attorneys' fees and costs as the prevailing party under Section 605. For the reasons that follow, the motion is granted, but only in part.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and page or paragraph number.

## I. Background

In setting forth the facts in this post-trial setting, the evidence is interpreted in G&G's favor on liability, because G&G prevailed on that issue. On willfulness and commercial advantage, however, the Castillos won, so the evidence on those issues is read in their favor.

### A. G&G

G&G was a commercial distributor of pay-per-view events, including special sporting events, concerts, and boxing matches. R. 409, Trial Tr. Vol. 2 at 159:19-22. Founded in 2009, it worked with networks like Showtime and HBO to advertise, sell, and distribute pay-per-view events to commercial accounts like bars, restaurants, and nightclubs. *Id.* at 160:1-14. G&G had "exclusive rights" to distribute the events to commercial establishments, meaning any commercial establishment that wanted to play the event needed to go through G&G and pay them a licensing fee. *Id.* at 160:15-24. The fee varied based on the guest capacity of the commercial establishment. *Id.* at 162:12-21. G&G in turn either split that fee with the network or paid the network an up-front fee for the right to distribute the program. *Id.* at 160:23-161:4. Again, all that was for distribution at *commercial* establishments; G&G has never acquired or sold rights for *residential* distribution. *Id.* at 169:1-8.

G&G alleged that it owned the commercial-distribution rights to a boxing match between Austin Trout and Saul Alvarez televised on April 20, 2013 (call it the Program, for convenience's sake). R. 413, Trial Tr. Vol. 6 at 555:13-17. G&G's president, Nicholas Gagliardi, testified that G&G had a "split deal" with Showtime for the

Program—G&G kept 30% of money generated from selling the Program to commercial accounts, and would send the remaining 70% back to Showtime. Trial Tr. Vol. 2. at 161:17-24. Gagliardi explained that G&G's deals with Showtime were often set up in this way and were historically arranged by Gagliardi's brother, who "had been working with Showtime for several years in doing distribution." *Id.* at 161:17-21. Gagliardi also testified about a "rate card" that G&G gave to its sales representatives for the Program. The card showed that an establishment with a capacity of 0-100 people would need to pay $800 to play the Program. *Id.* at 164:8-165:14, 166:21-167:3. Included in this fee was the cost to activate an account through either DirecTV or DishNetwork, because access to those providers was required to show the Program. *Id.* at 167:7-13.

Gagliardi also testified that, in lieu of a formal written contract, G&G's deals with Showtime were typically discussed via email and phone. Trial Tr. Vol. 2 at 170:19-171:3. Despite the history of email communications, Gagliardi was unable to find emails with Showtime negotiating the rights to the Program because his computer had been corrupted, and he was not able to restore it. *Id.* at 171:4-10. But G&G was able to present, at trial, the check that G&G sent to Showtime after the Program was broadcast, representing 70% of the total distribution sales, or $220,331. *Id.* at 172:7-173:17. The check referenced the date of the Program on the memo line, and Gagliardi testified that G&G sent the check to Showtime and that the company cashed it. *Id.* at 173:18-174:4.

3

On top of its agreement with Showtime, G&G had a separate written agreement with DirecTV, the satellite provider for the Program. Trial Tr. at 174:23-175:18. Gagliardi explained that the agreement required any commercial account ordering the fight through DirecTV to purchase it through G&G. *Id.* at 178:22-179:4. G&G presented the agreement—entitled Program Exhibition Agreement—at trial, although the copy shown to the jury was signed only by Gagliardi on behalf of G&G. *Id.* at 177:2-5, 181:14-24. Gagliardi explained that DirecTV would prepare and send the agreements to him, and that the copy of the Program agreement he was able to track down was the version he signed and returned to DirecTV, rather than the fully executed version. *Id.* at 181:20-24, 183:2-9. Gagliardi clarified, though, that the two parties had an executed agreement pursuant to which he paid DirecTV money to broadcast the program. *Id.* at 182:3-9.

G&G also presented a document referred to as the domestic distribution rights agreement. Trial Tr. Vol. 2 at 182:10-12. Gagliardi explained that he likely provided this document to G&G's attorney and sales representatives because it explained that Showtime had granted G&G "exclusive domestic closed-circuit distribution and licensing rights" to the Program. *Id.* at 182:13-18, 183:19-184:17. Gagliardi testified that G&G had commercial licensing agreements for the Program with Buffalo Wild Wings, Hooters, Dave & Buster's, and several other national chain restaurants, along with other smaller businesses. *Id.* at 192:18-22.

Gagliardi also discussed the ways commercial customers are able to "steal" a program, meaning broadcast the program without paying for it. He explained that

4

technology and streaming had made it much easier for businesses to broadcast pay-per-view programs without paying the requisite fee, and that this "has a great impact on [his] business." Trial Tr. at 186:12-20. According to Gagliardi, every time a commercial location pirates a broadcast, it has a ripple effect beyond that one establishment—it discourages other establishments from purchasing because they feel that it is not worth it if other nearby businesses are showing the same program for free. *Id.* at 187:2-8. As a result, G&G hires investigators to locate businesses that illegally broadcast their programs. *Id.* at 191:4-15.

### B. La Peña

La Peña was a Chicago restaurant owned and operated by Jaime and Maria Castillo. R. 411, Trial Tr. Vol. 4 at 345:23-346:1; 347:16-24. The Castillos opened the restaurant in 2001 after they bought the building in which La Peña is located. *Id.* at 346:2-12. In addition to the restaurant on the first floor, the building has four apartments upstairs, including the apartment where the Castillos live. *Id.* at 346:15-24. In 2013, the Castillos had accounts with multiple cable providers. They had accounts for their apartment with Comcast and Dish Network, as well as an account with DirecTV for the restaurant. *Id.* at 350:24-351:23. Jaime testified that he was the one to set up all of the accounts, including the DirecTV account for La Peña, which he opened in November 2011. *Id.* at 351:9-352:3. Jaime testified that he believed (in his own mind) that the DirecTV account was set up in La Peña's name as a *business* account, but it is undisputed that it was actually set up as a *residential* account in Jaime's name. *Id.* at 352:20-355:25.

5

For the entertainment of La Peña's customers, the Castillos play different types of music and also show sports and other programming on a number of televisions in the restaurant. Trial Tr. Vol. 4 at 380:8-381:18. It is undisputed that on April 20, 2013, a La Peña employee played the Program on the televisions around the bar in the restaurant. *Id.* at 384:2-10. Jaime testified that this happened only because a customer came into La Peña and asked to watch the Program. *Id.* At trial, Jaime could not remember what the customer looked like. *Id.* at 386:15-24. But at her deposition, Maria testified that Jaime told her that the customer who asked to watch the Program looked "Hispanic." R. 412, Trial Tr. Vol. 5 at 487:22-489:12. In any event, as far as Gagliardi knows, G&G never authorized La Peña to show the Program. Trial Tr. Vol. 2 at 185:20-22.

On the night of the Program, a private investigator named Aaron Lockner was working for G&G's attorney and drove around Chicago looking for businesses that were illegally broadcasting the Program. R. 410, Trial Tr. Vol. 3 at 261:19-262:12. Lockner received a list of businesses that paid for the Program ahead of time, so he was "basically hunt[ing] around and search[ing] around for places that were not on that list." *Id.* at 262:15-18. Lockner was paid for his work based on the number of commercial establishments he found in violation and reported on, meaning he was incentivized to find as many violators as possible. *Id.* at 263:8-19. If he found violators, then his job was not to ask them to turn off the Program, but rather to discreetly take pictures and video of the broadcast as evidence of the violation. *Id.* at 265:15-266:17.

Lockner testified at trial that he noticed La Peña on the night of the Program, because he could see, as he was driving by, a boxing match on the televisions inside. Trial Tr. at 269:11-15. He then walked inside the restaurant where he saw three wall-mounted televisions playing the Program. *Id.* at 278:14-19, 280:19-281:18. Lockner was able to catch some of the Program on his camcorder from inside the restaurant; the video was played at trial. *Id.* at 289:5-290:15. He also read from the affidavit that he wrote and executed; the affidavit's content was based on the notes he took that night. *Id.* at 278:14-19, 300:13-22. In the affidavit, Lockner explained that he watched Rounds 4 and 5 of the fight; he estimated that the capacity of the restaurant was 120 people; and that he counted between 60 and 65 patrons in the restaurant. *Id.* at 282:18-283:12. After recording the video inside La Peña, Lockner walked out and took additional video of the outside of the restaurant (that video, too, was played at trial). *Id.* at 294:22-295:6; 298:5-15. In the video, it is possible to see a boxing match playing on the TVs through the front window. *Id.* at 295:7-296:7.

At trial, Lockner testified that he did not ask anyone in La Peña to turn on the Program because it was not "honest." Trial Tr. Vol. 3 at 296:13-24. Lockner also stated that he does not speak Spanish, he is not of Spanish descent, and that he had long hair, past his shoulders, in 2013. *Id.* at 279:20-23, 296:25-297:10. According to his affidavit, Lockner was in La Peña for 10 minutes and then took the film outside on the sidewalk for just another minute or two. *Id.* at 299:8-17, 300:10-12. He also testified that he did not speak to anyone inside of La Peña, either customer or staff. *Id.* at 311:8-23.

## C. Procedural History

Lockner's affidavit eventually made its way to G&G's attorney, Thomas Riley, prompting Riley to send a letter to the Castillos outlining their alleged violations and requesting a settlement. R. 178.1, Riley Ltrs. at 2. Riley sent three more letters offering to settle with the Castillos, but they refused. *Id.* at 3-6. Finally, in March 2014, G&G filed suit against the Castillos and their holding corporation, El Bajio Enterprises, alleging violations of the Communications Act of 1934 (as amended), 47 U.S.C. § 605, and the Cable and Television Consumer Protection and Competition Act of 1992, 47 U.S.C. § 553. R. 1, Compl. ¶ 1. The Castillos eventually filed counterclaims against G&G, as well as DirecTV and Riley, alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the federal Racketeer Influenced and Corrupt Organizations Act. R. 178, Third. Am. Counterclaim.

In June 2018, the Court granted summary judgment to the Castillos on G&G's Section 553 claim but dismissed all of the Castillos' counterclaims. R. 350, 6/20/18 Memo. Opinion and Order. The parties began trial on G&G's remaining Section 605 claim in January 2019. After hearing four days of testimony and evidence, the jury returned a liability verdict in favor of G&G, finding that G&G had the exclusive commercial distribution rights to the Program and that the Castillos were not entitled to show it in La Peña. R. 403, 1/10/19 Minute Entry. The jury also found that (1) the Castillos did not act willfully or for the purposes of direct or indirect commercial advantage or private financial gain; and (2) the Castillos were not aware and had no reason to believe that their acts violated the law. *Id.* In August 2019, the Court denied

the Castillos' post-trial motion for judgment as a matter of law or, in the alternative, a new trial, and awarded $800 in statutory damages to G&G. R. 423.

## II. Standard of Review

Under 47 U.S.C. § 605(e)(3)(C)(i), an aggrieved party is entitled to either actual damages suffered as a result of the violation and any profits of the violator that are attributable to the violation, or statutory damages for each violation in a sum not less than $1,000 or more than $10,000. If statutory damages are awarded, then district courts have discretion to decide the amount. § 605(e)(3)(C)(i)(II). In addition, Section 605(e)(3)(C)(iii) allows courts to reduce damages awards where "the violator was not aware and had no reason to believe that his acts constituted a violation of this section." This Court previously awarded G&G $800 in statutory damages, which was the equivalent of what the Castillos would have had to pay had they legally bought the program. R. 423 at 20-21.

Similarly, the statute entitles an aggrieved party to fees and costs: "The court shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 605(e)(3)(B)(iii). "[T]he losing party bears the burden of an affirmative showing that taxed costs are not appropriate." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005).

## III. Analysis

### A. Attorneys' Fees

G&G has moved for $237,556.00 in attorneys' fees, comprising 381.7 hours of counsel-of-record time (attorneys Zane Smith, Andre Ordeanu, and Boris Samovalov) at $400/hour ($152,680.00) and 514.4 hours for an unnamed "research attorney" at

9

$165/hour ($84,876.00). R. 426 at 29. G&G proposes to apply the "lodestar" rule for calculating reasonable attorneys' fees, which multiplies "the number of hours reasonably expended on the litigation … by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Although there is "a strong presumption that the lodestar calculation yields a reasonable attorneys' fees award," *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 639 (7th Cir. 2011), "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley*, 461 U.S. at 434. The Court must also "exclude … hours that were not 'reasonably expended'" and—important here—the Court may also "adjust the fee upward or downward" based on "results obtained." *Id.* "If … a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436.

Remember that G&G obtained only $800 in statutory damages, R. 423, even though it had sought as much as $300,000, R. 1. The Castillos denigrate the $800 as a "nominal" award, R. 431 at 3, and ask the Court instead to apply *Farrar v. Hobby*, 506 U.S. 103, 115 (1992), which suggests that prevailing plaintiffs who win only nominal damages should receive an attorneys' fees award of zero. In support of this argument, the Castillos say that the $800 recovery is only 0.26% of the $300,000 G&G originally sought; that the jury finding that the Castillos did not willfully violate G&G's rights severely limits the recovery available; and that G&G's lawsuit amounts to a "shakedown" and thus that a windfall in attorneys' fees cuts against public policy. R. 423 at 3.

10

Although the $800 award is relatively small, it is not "nominal." The award is based on a specific theory of *compensation*, providing G&G with the licensing fee it otherwise would have received had the Castillos lawfully bought the right to distribute the Program. A nominal damages award is merely a symbolic award to recognize a finding of liability, whereas compensatory damages goes beyond that to provide recompense to the plaintiff for the violation of its legal rights. *See Redding v. Fairman*, 717 F.2d 1105, 1119 (7th Cir. 1983) (recognizing that nominal damages do not measure any injury, in contrast to compensatory damages). Having said that, after analyzing the fees that are properly supported by the record and not successfully objected to by the Castillos, the Court will reduce the lodestar amount in consideration of the relatively minor award obtained relative to what was sought.

Moving on to the proposed attorney hours and rates, both parties' presentations—or lack of presentations—make the task of evaluation needlessly difficult. Under Local Rule 54.3, the parties were supposed to confer enough to generate a "joint statement" listing the claimed amount by the movant, a table of contested fees with accompanying details, and "a brief description of each specific dispute remaining between the parties." Local R. 54.3(e). The parties did not do that. Instead, the parties submitted separate correspondence, leaving it for the Court to piece together the different objections and match them with proposed amounts, and then the parties filed briefs. This is disappointing.

As a result of the disjointed presentations and lack of specifics on both sides, the parties have forfeited their opportunity to make or respond to certain objections,

11

allowing the other to win that point by default, as the Court will now describe. First, G&G provided the Castillos with time records describing and itemizing the time of three named attorneys who were counsel of record: Zane Smith, Andre Ordeanu, and Boris Samovalov. *See* R. 426-1. So far, so good. But these records also bulk-bill "research attorney" time, sometimes in ways that defy the laws of time—for example, 33 hours on April 16, 2016—and are often quite unspecific. For example, that same entry simply lists "Research and work in connection with preparation of Opposition to Defendant's Class Action Certification." *See* R. 426-1 at 13. But it was not just G&G that offered vague argument. The Castillos' counsel created an alphabetic system for noting objections to time entries, marking "A," "B," "C," or "D" next to each item. *See* R. 427-1 at 20-29. The Castillos' cover letter to G&G offers a simple legend explaining what the Castillos meant by each letter. But the objections are just *conclusions*, not a description of the objection, and often lump together a myriad of reasons. For example, each "A" designation purports to be an objection to the time entries as "Form documents for which a paralegal could have updated captions, addresses[,] or other non-form information, and for which an attorney should not have billed the number of hours reflected, or for time entries that appear excessive." R. 427-1 at 18. "Time entries that appear excessive" is devoid of content. Nor is that conclusion the same as objecting on the basis that a "paralegal could have updated captions." These objections are not specific enough to rebut the statutory and decisional presumptions in favor of viewing time records attributed to specific attorneys, with specific times, dates, and reasonably detailed descriptions of the work, as reasonable. *Farfaras v.*

*Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006). (explaining that, although "vague descriptions and block billing" are not the best practices, they are not strictly prohibited, and district courts may take into account the comparative specificity of each side's objections and responses in making their final determinations of reasonable attorneys' fees). The same goes for the other letter designations; merely labelling an entry with a conclusory objection is no objection at all. The letter-based objections are rejected as insufficiently detailed in describing the reason why the entry is unreasonable.

That said, two of the Castillos' other objections are detailed enough to be considered by the Court, and the Court agrees with the Castillos that the lodestar should be reduced. First, on the "research attorney" time, the Castillos argue that the Court cannot and should not "award any amount for an unnamed individual whose qualifications cannot be evaluated by this Court," in addition to the daily time entries that are nearly or more than 24 hours. R. 427-1 at 19. G&G does not offer any more detail on the unidentified research attorney (and that detail had to be disclosed during the Local Rule 54.3 conferral anyway). On the dubious number of hours for particular days, G&G says that the research-attorney hours were assigned to the date that the projects were *completed* and are not necessarily the date on which the work was done. R. 427 at 8-9. That is a bizarre approach to billing, and G&G does not cite any precedent for that approach.

Billing hours for the days on which they were worked assists the Court in evaluating the reasonableness of the entries, because each entry should be more detailed

13

in describing the work attributed to that particular time block. For example, a lawyer crafting a motion to dismiss might bill for research on subject matter jurisdiction on one day, and then on personal jurisdiction the next day, and then on Rule 12(b)(6) the third day. In contrast, a fee proponent should not be able to impede the evaluation of the reasonableness of the time expenditure by lumping all the hours into a single number assigned vaguely to "research on motion to dismiss." In light of the unreasonable approach that G&G took to billing the research attorney's time, the Court declines to award fees for any research attorney time. G&G has not otherwise supported this request by reliable record-keeping or information about the qualifications of the research attorney (or perhaps it was more than one research attorney), so all of those hours are rejected.

Second, the Court sustains the Castillos' objection to the proposed hourly rates. Remember that G&G sought the same hourly rate, $400, for each of the three named attorneys whose time was billed. But this across-the-board rate does not make sense: Zane Smith is a partner, and Andre Ordeanu and Boris Samovalov are associates. As the Castillos point out, usually attorneys with disparate job titles, presumably reflecting different experience and expertise levels, are billed at different hourly rates. The Castillos suggest a rate of $250 per hour for attorney Smith and $151.25 per hour for the associates. R. 427-1 at 18. Once again, G&G does not rebut this objection with sufficient evidence, providing only an affidavit from Mr. Samovalov. But the affidavit does not explain why the attorneys are billed at $400 and does not explain why the same rate applies to attorneys with different experience levels. G&G does cite two

14

district-court opinions in which the Smith firm was awarded $400 per hour for each attorney's time. R. 427-1. Neither of these opinions is squarely on point. One case did not involve a challenge to the hourly rate, *see J&J Sports Productions, Inc. v. Rafiq*, No. 1:17-cv-07347, R. 95 at 3 (N.D. Ill. Sept. 30, 2019), and the other opinion sets the rate without saying why, *see J&J Sports Productions, Inc. v. Dalal*, No. 6:18-cv-06038-RTD, Dkt. 42 at 3 (W.D. Ark. Sept. 16, 2019). Given G&G's failure to support the requested rate, the Court sets the rates at $250 per hour for Smith and $151.25 per hour for the associates. (There is also a computational adjustment, noticed by the Castillos and not disputed by G&G, that reduces the number of hours attributable to Ordeanu by a net of 35 hours and reduces the number of hours attributable to Samovalov by 3 hours. *See* R. 427-1 at 18.)

Applying the reductions (that is, subtracting the research attorney time in full and adjusting the hourly rates), the lodestar total is $63,166.00. The underlying calculation is this: $169,480.00 of named attorney time requested by G&G, minus $15,200.00 due to arithmetic errors; and minus $91,114.00 representing the reductions in hourly rates. But the relatively small $800 statutory damages award justifies a reduction in the lodestar amount. Although not a nominal award, still the $800 is a fraction of what the Plaintiffs sought in the original Complaint, that is, $300,000. To take a case through a federal jury trial to end-up with a $800 recovery does not justify a full lodestar amount. To be sure, G&G had to fend off the Castillos' entrapment theory, which took substantial time and effort not usually expended in this type of case. All in all, the Court finds that a 50% reduction in the lodestar amount is

15

appropriate in balancing the very modest success with the successful refutation of the defense case. With half off, the final amount of attorneys' fees awarded is $31,583.00.

### B. Taxable Costs

G&G has also moved for $26,256.92 in taxable costs. R. 425. Here again, however, most of the proposed costs are not supported by sufficient evidence. For example, although G&G has submitted numerous invoices and check images, for very few of them has it submitted any proof that the invoices were paid and the checks were cashed. The following list comprises the taxable costs for which *reliable* documents in the record already show *actual* payment:

- Filing fee of $400, substantiated by the case docket;

- Transcript of proceedings on April 27, 2016, invoice for $29.10 marked as paid by the court reporter, R. 425-1 at 26;

- $558.00 for trial transcripts, as substantiated by an email of March 3, 2019, from the court reporter, R. 425-1 at 28; and

- $1,600.00 for Spanish-interpretation services at trial, substantiated by an invoice from interpreter Alex Gualino marked as paid as of January 10, 2019, R. 425-1 at 64.

Although G&G submitted some invoices from Discovery Data Solutions for copying costs, marked "Paid," *see, e.g.*, R. 425-1 at 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 54, the Castillos correctly point out that the invoices are billed to a separate law firm, the Law Offices of Thomas P. Riley. R. 431 at 12. Riley is listed on the docket only as a deponent in this case (it is true that he represented G&G pre-suit, but the invoices

16

are from 2015 and 2016, when he was not counsel of record). Also, G&G does not address this objection and thus has forfeited its opportunity to do so.

In total, therefore, the Court awards G&G $2,587.10 in taxable costs.

### III. Conclusion

Pursuant to 47 U.S.C. § 605(e)(3)(B)(iii), the Court awards G&G $31,583.00 in reasonable attorneys' fees and $2,587.10 in taxable costs, for a total of $34,170.10. The tracking status hearing of December 11, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 30, 2020